```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                             MIAMI DIVISION
                        CASE NO. 1:16-cr-20390-BB-1
 3


 4      UNITED STATES OF AMERICA,

 5              Plaintiff,                      February 3, 2017
                                               3:46 p.m.
 6              vs.

 7      GERTI MUHO,

 8              Defendant.                      Pages 1 THROUGH 69

 9      _____


10
                         TRANSCRIPT OF MOTION HEARING
11                   BEFORE THE HONORABLE BETH BLOOM
                       UNITED STATES DISTRICT JUDGE
12

13      Appearances:

14      FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                            SEAN THOMAS MCLAUGHLIN, AUSA
15                          99 Northeast 4th Street, 8th Floor
                            Miami, Florida 33172
16

17      FOR THE DEFENDANT:  DAVID SCOTT HARRIS, ESQ.
                            6431 Southwest 39th Street
18                          Miami, Florida 33155

19

20      COURT REPORTER:     Yvette Hernandez
                            U.S. District Court
21                          400 North Miami Avenue, Room 10-2
                            Miami, Florida 33128
22                          yvette_hernandez@flsd.uscourts.gov

23

24

25
```

```
 1          (Call to order of the Court, 3:46 p.m.)

 2          (Defendant present.)

 3          COURTROOM DEPUTY:  Calling Case Number 16-20390,

 4     Criminal, United States of America v. Gerti Mujo.

 5          Counsel, please state your appearances for the record.

 6          MR. MCLAUGHLIN:  Good afternoon, Your Honor.

 7          Sean McLaughlin on behalf of the United States.  Also

 8     with me at counsel table are US Postal Inspection Service

 9     Investigator Bob Pasero and US Postal Inspector Anthony Arena.

10          THE COURT:  Good afternoon.

11          MR. HARRIS:  Good afternoon, Your Honor.

12          David Harris for the Defendant, Gerti Mujo.  To his

13     left is Kathy Hamilton, my assistant.

14          THE COURT:  Good afternoon to each of you.

15          Before the Court for a hearing today is the

16     Defendant's motion to set a reasonable bond, Docket Entry 66.

17     The Court has also received the Government's response, and the

18     Government is correct that the Court should properly hold a

19     hearing on the Government's motion for pretrial detention based

20     on a risk of flight and danger to the community.

21          I note that the motion to set a reasonable bond states

22     within the body of the motion that no bond was set in this case

23     and the parties, in fact, stipulated, at Docket Entry 22, to a

24     bond amount.  So while the Court can certainly deny this as

25     moot, since there's already been a determination by way of a
```

1    stipulation, the Court has now received the Government's filing

2    requesting a hearing relating to their motion.

3         So perhaps my question, Mr. Harris, is:  Are you

4    moving forward on your motion to set a reasonable bond in light

5    of the fact that on June 22nd, 2016, based on an agreement of

6    the parties, a bond was already established by Judge Hunt?

7         MR. HARRIS:  Thank you, Your Honor.

8         A couple of preliminary matters.  For one, on

9    Mr. Muho's behalf, I have also filed a motion for him to appear

10   pro se going forward.  He has asked me to convey to this Court

11   his interest and desire to be heard on all future motions,

12   including this one for bond.  That being said, we would like to

13   proceed with the motion to have bond.

14        It's my understanding, although I was not here -- it

15   was previous counsel -- as part of the stipulation that the

16   part that was objected to in that particular stipulation by

17   Mr. Muho was the corporate surety part because he had no

18   pledge, no assets, he had never agreed to that, although there

19   was --

20        THE COURT:  Mr. Harris, rather than getting into the

21   merits of the motion --

22        MR. HARRIS:  Understood.

23        THE COURT:  -- my question was merely whether the

24   Defendant is moving forward.

25        MR. HARRIS:  Yes.

1    THE COURT:  The Court has, with regard to the other

2    motion filed by Mr. Muho -- and there have been many filings in

3    this case -- but it is the Defendant's motion to proceed pro se

4    and have David Harris, Esquire as standby counsel.

5    As I'm certain that you have counseled Mr. Muho -- but

6    if not, I will advise the gentleman -- that he has no

7    Constitutional right to the appointment of standby counsel.  So

8    his request must be unequivocal that he seeks to proceed pro

9    se, representing himself, and the Court will proceed to a full

10   Faretta Inquiry.  But that is the decision that he needs to

11   make.  His motion was styled as an "and."  And he has no right

12   to proceed pro se and to have attorneys sitting next to him as

13   standby counsel.

14   So Mr. Harris, what would you like to do at this time,

15   sir?  Before the Court scheduled for hearing is the motion to

16   set reasonable bond.

17   MR. HARRIS:  Right.

18   THE COURT:  And my question is whether you're seeking

19   to move forward on a setting of a reasonable bond, when there

20   was a stipulation by the parties -- and I recognize it may have

21   been before you were in in this case.  There have been several

22   counsel in this case.

23   MR. HARRIS:  Right.

24   THE COURT:  So what would you like to do, sir?

25   MR. HARRIS:  It's my understanding that my client

1      would like to first be heard as pro se and then proceed with

2      the motion for bond on his own behalf.

3              THE COURT:  Mr. Mujo, is it your request to proceed

4      pro se in this case, recognizing that you have no

5      constitutional right to standby counsel?

6              THE DEFENDANT:  I'm sorry, Your Honor.  I do not

7      understand the question.

8              THE COURT:  The question is whether you wish to

9      proceed pro se.  That's not the motion that was filed.  Your

10     request to proceed pro se, representing yourself, must be clear

11     and unequivocal.  And by way of this motion, it is not clear

12     and unequivocal.

13             THE DEFENDANT:  Your Honor, I would then like to make

14     it clear and unequivocal that I wish to proceed pro se

15     without -- without -- without -- regardless of whether I will

16     be -- I will be afforded the right in this case to have standby

17     counsel.  I would first and foremost -- first and foremost, I

18     would like to proceed pro se and then it would be a subsequent

19     request that I be allowed to have standby counsel in the case.

20             THE COURT:  But I want you to understand there is no

21     condition.  The Court will make a full inquiry as to whether

22     you are capable of representing yourself, and there is no right

23     to standby counsel.  And the Court is free to exercise its

24     discretion to deny that right, and you would be representing

25     yourself without the assistance of either Ms. Hamilton or

1  Mr. Harris, or any other attorney, by your side.  Do you

2  understand that, sir?

3         THE DEFENDANT:  Your Honor, I understand.  And I'm not

4  trying to trick Your Honor into -- I would like to go pro se.

5  And with regard -- so let me rephrase that.  I would like at

6  this time to move to proceed pro se in this case, but --

7  regardless of whether -- any future requests I may or may not

8  make to have standby counsel be granted or not in the case.

9         THE COURT:  It cannot be conditioned, sir.  Your

10  request needs to be unequivocal, and that is that you wish to

11  represent yourself and Mr. Harris and Ms. Hamilton will no

12  longer be representing you.  You will be proceeding on your

13  own.

14         THE DEFENDANT:  Correct.  I would like to make that

15  request at this time, Your Honor.

16         THE COURT:  If you'll stand, raise your right hand to

17  be placed under oath.

18    GERTI MUHO, DEFENDANT, SWORN

19         THE COURT:  What is your full name?

20         THE DEFENDANT:  My full name is Gerti Muho.

21         THE COURT:  Mr. Muho, I understand you want to waive

22  your right to counsel and represent yourself in this case.

23         THE DEFENDANT:  That's correct.  I do.

24         THE COURT:  Is that because you are not satisfied with

25  the counsel in your case?

```
 1              THE DEFENDANT:  That is not the reason.

 2              THE COURT:  What is the reason why you want to

 3      represent yourself?

 4              THE DEFENDANT:  The reason why I would like to

 5      represent myself at this time is in order to be able to

 6      fully -- fully -- fully -- fully make my defense at -- at

 7      trial, which is scheduled within the next three weeks.  It

 8      would -- it is -- I am presented with -- with -- with -- with

 9      the reality that it may -- it may not be possible for me at

10      this time to prepare for counsel -- for any counsel to be able

11      to prepare in time to fully present my defense, fully present

12      my argument and my defenses in this case, and to fully be able

13      to question and cross-question any witnesses that may be put

14      forth by the Government in this case.

15              THE COURT:  You've just told this Court that you would

16      not be able to prepare for this case.

17              THE DEFENDANT:  Counsel.  I would not be able to

18      prepare counsel to be -- to do those -- those -- those

19      planned -- so to rephrase, I would not be able to help counsel

20      properly prepare and I would be -- I would -- absent going pro

21      se, I would be running the risk, I believe, of having counsel

22      who is inadequately prepared to make my defense in this case.

23      Whereas, I myself am fully aware of all the evidence in this

24      case.  I am fully aware of all the arguments, whether by -- or

25      expected arguments that may be -- may be made by the
```

1    Government.  I'm fully aware of the -- all the witnesses and

2    all the statements that -- that -- you know, that I have seen

3    to date that would allow me the cross-examine and -- and -- and

4    put question -- and, you know, question the -- the -- the

5    Government's case against me -- in -- in this matter.

6              THE COURT:  So you believe that Mr. Harris is

7    inadequately prepared for your case?

8              THE DEFENDANT:  I believe that the case would --

9    that -- that -- that the -- the case as it stands at this point

10   would prevent Mr. Harris from being able to fully -- fully

11   present my defense to the Court and jury in time for the

12   scheduled trial.

13             THE COURT:  Why is that, sir?  Why do you believe

14   that?

15             THE DEFENDANT:  Because -- because the trial date is

16   only three weeks away.  I have yet to review the -- I have yet

17   to receive all the evidence in the case.  I have never to date

18   actually seen -- well, I've seen some of the evidence, but

19   not --

20             THE COURT:  I'm not speaking of you.  I'm asking

21   specifically -- and I want to make sure that you are able to

22   answer my questions because that factors into the Court's

23   determination as to your ability to represent yourself at

24   trial.

25             So I'm not sure, Mr. Muho, if you're understanding my

1    question.  But my question is:  Why do you believe that your

2    attorney is not prepared for trial?

3          THE DEFENDANT:  I believe the complexity of the

4    case -- I believe the complexity of the case would prevent an

5    attorney -- a new-coming attorney, such as Mr. Harris, to be

6    able to come to grasp with all the -- with all the complexity

7    of the case that exists.

8          Also, the case contains multiple parts so to speak.

9    And for someone to come in and to read -- there's voluminous

10   evidence, as the Government calls it.  And for someone to come

11   in and be able to grasp all the -- all the -- all the -- all

12   the relevant evidence in the case, all the relevant filings

13   that have predated -- that predate this case by up to three

14   years, it would be -- it would be impossible, in my -- well, it

15   would be a very difficult work for any one human being to be

16   able to come to grasp with all the evidence that is relevant to

17   this case.

18         Whereas, myself, I believe that I, being the one who

19   has penned most of those statements and all those -- all those

20   relevant filings in the case, would be -- would be quickest --

21   would be best able to present my defense and to be able to

22   quickly -- so there's -- so to sum up that argument, it's

23   because of the sheer volume of the evidence in the case.  And

24   me, myself being the one who -- I created -- who created most

25   or a large part and having lived the evidence, so to speak, I

```
 1    would be in the best position, I believe, to present my defense
 2    in this case.
 3              THE COURT:  Your attorney, Mr. Harris, who is the
 4    third attorney on this case, filed an appearance on
 5    January 5th.  Are you stating that you don't believe that your
 6    attorney is able to present your case because of the number of
 7    documents and the short period of time or are you saying that
 8    your attorney has not shown the competence to be able to
 9    effectively represent you?
10              THE DEFENDANT:  I would -- I would -- I would -- I
11    would say on the first -- on the first one, which is that given
12    the attorney came into this case -- came on this -- became --
13    entered an appearance for me in this case on January 5th and
14    the sheer volume -- voluminous of the case and our review of
15    the evidence to the case to date leads me to -- leads me to
16    believe that I myself would be in a better position than
17    Mr. Harris to present my defense.
18              THE COURT:  So my question, Mr. Muho, so that the
19    record is very clear:  Is it your desire to represent yourself
20    in this case?
21              THE DEFENDANT:  Yes, Your Honor, it is.
22              THE COURT:  Does it have anything to do with being
23    dissatisfied with the representation by your attorney,
24    Mr. Harris?
25              THE DEFENDANT:  No, it does not, Your Honor.
```

```
 1              THE COURT:  You are charged with serious crimes.  Do
 2     you know what these charges are?
 3              THE DEFENDANT:  I am -- I -- Your Honor, I am charged
 4     with 37 counts of -- of felonies -- of felony -- felony --
 5     felony-type counts.  Counts 1 -- I can -- the -- Counts 1
 6     through 17 are counts of bank fraud.  Counts 18 and 19 are
 7     counts of wire fraud.  Counts 20 to 37 are counts of identity
 8     theft -- aggravated identity theft, which -- which -- which is
 9     an aggravation charge, which is an enhancement penalty, so to
10     speak, for one of the underlying crimes, 1 through -- 1
11     through -- in Counts 1 through 7 -- 19, Your Honor.
12              THE COURT:  Mr. McLaughlin, I would like you to
13     describe the charges, the elements of the offenses, with regard
14     to these 37 counts in the Superseding Indictment.
15              MR. MCLAUGHLIN:  Certainly, Your Honor.
16              As charged in the Superseding Indictment, which is
17     Docket Entry 46, Counts 1 through 17 charge bank fraud, Counts
18     18 through 19 charge wire fraud, and Counts 20 through 37
19     charge aggravated identity theft.
20              The elements -- just generally, I don't have them in
21     front of me, as to aggravated identity theft, is essentially
22     that the Defendant, without lawful authority, transferred,
23     possessed, and used a means of identification of another person
24     during and in relation to a specified bank or wire fraud count.
25              So if you look at the Superceding Indictment, the
```

```
1    Government alleges not only the means of identification, the

2    specific victim is identified by initials, but also what counts

3    those correspond to.

4              For the most part, bank and wire fraud elements are

5    essentially the same.  Essentially, that the Defendant created

6    or executed, or attempted to create, a scheme and artifice to

7    defraud.

8              As to bank fraud, in addition to executing a scheme

9    and artifice to defraud, that he attempted to obtain money,

10   credits, and things of that nature, in the custody and control

11   of a bank.  He did so by materially misrepresenting material

12   facts or concealing material facts.  And as to bank fraud, we

13   have to allege that the victim or the target of the fraud was a

14   financial institution.

15             The only difference essentially between bank fraud and

16   wire fraud is that interstate or foreign commerce wires were

17   used during and in relation to the scheme.

18             Those are the general elements.

19             THE COURT:  And can you advise the Court as to the

20   complexity of these 37 counts that the Government is aware of

21   based on the discovery that you have provided.

22             MR. MCLAUGHLIN:  I would -- in my opinion, Your Honor,

23   having done fraud cases, it's a fairly complex case in the fact

24   that there's very voluminous discovery in this case.  I think

25   we've turned over -- in addition to items seized at Mr. Muho's
```

```
1    residence pursuant to search warrant, pursuant to bank

2    subpoenas, a variety of other discovery in this case, there's

3    probably at least 50-plus-thousand pages of documents.

4          Now, I can tell the Court this:  What we've done in

5    discovery to aid Defense counsels -- there's been multiple

6    versions -- is with all of the discovery, we put them on a disc

7    each time.  So as you'll see in the Government's standard

8    discovery responses, you'll see, here's disc 7, here's disc 8

9    through 10.  On those discs are separate folders, which tell

10   Defense counsel specifically what's on there; Bank of America

11   records, TD Bank records.

12         And then in addition to that, every single time we

13   make a production, we have a detailed discovery log which tells

14   any defense counsel what specific records and accounts are

15   Bates stamped at what places.  So we've done our best, I think,

16   to expedite the complexity of discovery and make it simple for

17   any defense counsel to understand.

18         What we've also done, Your Honor, is -- what I've done

19   is essentially segregated out the most important records in the

20   case and put them together and called them essentially "hot

21   docs."  Those were produced in the very first discovery

22   response.  They are on disc number one.  And anyone who wants

23   to get familiar with the case can actually go through the hot

24   docs and see what are the relevant, most important documents

25   corresponding to each specific count.  It all kind of tells the
```

1    story of the case.

2           So in addition to the discovery log and labeling

3    folders, we've also done what's called essentially a hot docs

4    production as well.

5           THE COURT:  And if you can advise the Court and

6    Mr. Muho as to the maximum penalties of each offense, and that

7    would include the supervised release, any restitution, and any

8    fines to be imposed if he's found guilty of these offenses.

9           MR. MCLAUGHLIN:  The bank and wire fraud counts, Your

10   Honor, carry a 30-year statutory maximum with a term of five

11   years of supervised release.

12          In terms of the bank fraud counts, the Court can issue

13   a fine of up to a million dollars or double the gross proceeds.

14          The aggravated identity theft counts, Counts 20

15   through 37, carry a maximum of life, but a mandatory minimum

16   sentence of two years imprisonment for each count.  And what

17   the Court can do is run those counts consecutive to each other

18   and they must run them consecutive to any other sentence.

19          So any other sentence that Defendant Muho gets for the

20   bank and wire fraud counts, anytime he's convicted of a

21   aggravated identity theft count, those aggravated identity

22   theft counts must run consecutive to his bank and wire fraud

23   sentence.

24          As to restitution, Your Honor, it is mandatory in this

25   case, under 18 USC 3663A and 3663.

1          THE COURT:  Mr. Muho, Mr. McLaughlin has set forth the

2     maximum penalties that can be imposed.  He's also advised --

3     which he is accurate -- that as to Counts 20 through 37, the

4     aggravated identity theft charges, if you are found guilty of

5     each of those offenses, the two-year imprisonment period must

6     run consecutive to any other sentence.

7          With regard to Counts 1 through 17, the maximum

8     penalty as to each count would be 30 years imprisonment.  As to

9     Count 18, the maximum penalty would be 30 years of

10    imprisonment.  Each of those offenses can be followed by

11    supervised release that can run consecutive.

12         With regard to the wire fraud count, 19, the maximum

13    penalty would be 20 years imprisonment, plus the Court can

14    impose three years of supervised release.

15         And as I've stated, with regard to Counts 20 to 37,

16    each carries with it, if you're found guilty, a maximum penalty

17    of two years that must run consecutive to any other sentence.

18    So as to counts 20 to 37, that would be a mandatory term of 34

19    years.

20         Do you understand the maximum penalties that can be

21    imposed?

22         THE DEFENDANT:  I do, Your Honor.

23         THE COURT:  Do you fully understand the consequences

24    of being found guilty of these offenses?

25         THE DEFENDANT:  I do, Your Honor.

```
1              THE COURT:  Mr. Muho, do you understand that you have
2         the constitutional right to be represented by an attorney?
3         You've advised the Court that Mr. Harris does not have an
4         adequate time to review the voluminous records.  Do you
5         understand that Mr. Harris would have available to him the
6         right to request a delay or a continuance of this trial in
7         order to be properly prepared?
8              THE DEFENDANT:  I do, Your Honor.
9              THE COURT:  Do you understand that you have the right
10        to be represented by counsel?
11             THE DEFENDANT:  I do, Your Honor.
12             THE COURT:  You understand that you also have the
13        right to represent yourself under certain circumstances and
14        there are issues that the Court needs to discuss with you
15        before I can determine whether you are able to represent
16        yourself.
17             Do you understand you have the right to represent
18        yourself?
19             THE DEFENDANT:  I do, Your Honor.
20             THE COURT:  Do you have any legal education or
21        training?
22             THE DEFENDANT:  I do, Your Honor.
23             THE COURT:  Please advise the Court.
24             THE DEFENDANT:  I have -- I have a three -- I have
25        a -- I have a law degree from the University of California at
```

```
 1    Berkeley.  I have also practiced for myself for about three
 2    years after.
 3              THE COURT:  I need you to speak into the microphone,
 4    sir.
 5              THE DEFENDANT:  I've also practiced for about three
 6    years after law school.
 7              THE COURT:  What type of practice, sir?
 8              THE DEFENDANT:  In various -- I've -- I've -- I've --
 9    I've -- I've primarily litigated my own -- my own rights to so
10    to speak.  I've -- I've filed -- I've -- I've -- I've -- I've
11    had -- I've litigated cases and I have been heard -- I've --
12    I've litigated cases, meaning by filing and --
13              THE COURT:  My question was:  What type of cases, sir?
14              THE DEFENDANT:  Racketeering -- racketeering --
15    racket -- multiple -- multiple cases of racketeering.
16              THE COURT:  Have you represented individuals in court
17    on charges of RICO or racketeering?
18              THE DEFENDANT:  I have.  I have.
19              THE COURT:  In what court and when, sir?
20              THE DEFENDANT:  I have represented myself in this
21    court -- in this very court in the Southern District of
22    Florida.
23              THE COURT:  And who did you represent, sir?
24              THE DEFENDANT:  The plaintiff, myself.
25              THE COURT:  So you proceeded pro se?
```

```
 1                THE DEFENDANT:  Pro se, correct.
 2                THE COURT:  Did you ever represent any individuals in
 3      court other than yourself?
 4                THE DEFENDANT:  No.
 5                THE COURT:  And was that a criminal case or a civil
 6      case?
 7                THE DEFENDANT:  It was a civil case.
 8                THE COURT:  Have you ever represented anyone in
 9      criminal court?
10                THE DEFENDANT:  I have served as a public defender.
11      During one of my -- during one of my law school -- summers of
12      law school, I served as a public defender in Modesto County
13      California in state -- state court.
14                THE COURT:  Were you certified to practice in the
15      court?
16                THE DEFENDANT:  I -- it was after my first year of law
17      school.  I believe I was always -- I was always acting under a
18      senior -- a senior public defender.
19                THE COURT:  Did you handle any cases in criminal
20      court?
21                THE DEFENDANT:  Yes, I did.  Although I was never the
22      main -- the primary advocate for the defendant.  I -- I -- I
23      partook in multiple -- multiple murder -- murder defenses,
24      where I aided -- I aided the defense.  I was not the primary --
25      the primary -- the primary advocate.
```

```
 1            I also -- I also act -- served for -- as a clerk for
 2     one semester for the First Circuit -- First -- for the First
 3     Appellate Circuit in California.  It was essentially a public
 4     defender for the appellate level, where I advocated mainly by
 5     writing, not in court.
 6            THE COURT:  Have you ever handled any criminal cases
 7     involving offenses of bank fraud, wire fraud, or aggravated
 8     identity theft?
 9            THE DEFENDANT:  I have not.
10            THE COURT:  Are you aware of the elements of each of
11     the offenses that the Government is required to prove?
12            THE DEFENDANT:  I believe I am.  I am.
13            THE COURT:  And when you say you believe you are, you
14     are, what information did you review?
15            THE DEFENDANT:  I have reviewed the United States Code
16     and I have reviewed the annotated -- United States Annotated
17     Code and all the case law relevant to the -- to the bank --
18     bank wire and the aggravated identity theft charges.
19            THE COURT:  Mr. Muho, do you understand that there are
20     many dangers and disadvantages to representing yourself?
21            THE DEFENDANT:  I do, Your Honor.
22            THE COURT:  You may be too involved to make the right
23     decisions.  Do you understand that?
24            THE DEFENDANT:  I understand that, Your Honor.
25            THE COURT:  You have no training or experience in
```

1  cases of bank fraud, wire fraud, and aggravated identity theft.

2  And while you may have a law degree, you have very limited

3  experience in criminal court.

4          THE DEFENDANT:  That is correct, Your Honor.

5          THE COURT:  Have you ever tried a case to a jury?

6          THE DEFENDANT:  I have not, Your Honor.  Only to a

7  judge.

8          THE COURT:  And you understand that this case will be

9  tried before 12 jurors?

10          THE DEFENDANT:  I -- I understand that, Your Honor.

11          THE COURT:  Have you ever tried a case before a jury

12  in any criminal or civil court?

13          THE DEFENDANT:  I have not, Your Honor.

14          THE COURT:  You will be subject and will be required

15  to follow all the same rules that Mr. McLaughlin or any other

16  attorney must follow.  And even if you make mistakes, you will

17  not get any privileges or benefits and I will not help you.  Do

18  you understand that?

19          THE DEFENDANT:  I understand that, Your Honor.

20          THE COURT:  You will not receive any special treatment

21  from the Court at all.  Do you understand that, sir?

22          THE DEFENDANT:  I understand that, Your Honor.

23          THE COURT:  You will be opposed by Mr. McLaughlin, who

24  is a trained, skilled prosecutor, who is experienced in

25  criminal law and courtroom procedures.  Unlike the prosecutor,

```
1   you will not know to complexities of jury selection.  You will

2   not know what constitutes a permissible opening statement to

3   the jury.  You will not know what is admissible evidence, what

4   is appropriate direct and cross-examination of witnesses, what

5   motions you must make, and when to make them during the trial

6   to preserve certain issues for post-trial motions, and to

7   protect your rights on appeal.  Do you understand that, sir?

8          THE DEFENDANT:  I understand that, Your Honor.

9          THE COURT:  Do you understand that you will not know

10  what constitutes appropriate closing argument?  Do you

11  understand that?

12         THE DEFENDANT:  I understand that, Your Honor.

13         THE COURT:  You will also not have counsel to assist

14  you in seeking any type of plea offer from the Government or in

15  evaluating any plea offer the Government may make to you.  That

16  means that you may overlook a defense or other factor that

17  might be important in deciding whether to plead.

18         You also won't have an independent opinion and

19  evaluation on whether under the facts of this case or the law

20  it may be wise to plead guilty.  Do you understand that, sir?

21         THE DEFENDANT:  I understand that, Your Honor.

22         THE COURT:  Do you understand that if you proceed to

23  trial, and you are convicted, you will be sentenced according

24  to the Sentencing Reform Act?  Do you understand that, sir?

25         THE DEFENDANT:  I understand that, Your Honor.
```

```
1              THE COURT:  Have you fully discussed with your

2     attorney the application of the advisory guidelines to this

3     case?

4              THE DEFENDANT:  I have, Your Honor.

5              THE COURT:  Do you understand the advisory guidelines?

6              THE DEFENDANT:  I do, Your Honor.

7              THE COURT:  When have you looked at them, sir?

8              THE DEFENDANT:  Multiple times, Your Honor.  Multiple

9     times over the past nine months since I've been in prison.

10             THE COURT:  Do you understand that the United States

11    Sentencing Commission has issued guidelines that the judges

12    must consult and take into account, but are not required to

13    follow, in determining the sentence in any criminal case?  Do

14    you understand that, sir?

15             THE DEFENDANT:  I do, Your Honor.

16             THE COURT:  Do you understand that in determining your

17    knowledge, the Court is required to calculate the applicable

18    sentencing guideline range and to consider that range, possible

19    departures under the sentencing guidelines, and other

20    sentencing factors, such as a variance under 18, United States

21    Code, Section 3553(a)?

22             THE DEFENDANT:  I understand, Your Honor.

23             THE COURT:  Do you understand what 18, United States

24    Code, Section 3553(a) is?

25             THE DEFENDANT:  I believe it's the sentencing
```

```
1    guidelines.  I may be wrong.
2              THE COURT:  It's a statutory provision that requires
3    that the Court take into consideration certain factors in
4    making a determination as to what is an appropriate sentence.
5              Have you had an opportunity to look at the sentencing
6    guidelines, including the application of 18, United States
7    Code, Section 3553(a)?
8              THE DEFENDANT:  I have not looked at the particular
9    section.  I do not believe I have, but I have -- again, I have
10   looked at the sentencing guidelines.
11             THE COURT:  Mr. Muho, do you understand that the
12   sentencing guidelines are complicated and if you continue to
13   represent yourself, you will not have anyone to advise you
14   concerning the guidelines or to tell you what factors the Court
15   must or should consider in determining your sentence?
16             THE DEFENDANT:  I do, Your Honor.
17             THE COURT:  Do you understand that you may overlook a
18   potential ground for departure or variance or other factor that
19   might be important in your presentation to the Court concerning
20   an appropriate sentence?
21             THE DEFENDANT:  I do, Your Honor.
22             THE COURT:  Sir, I've advised you and I want to ensure
23   that you understand that you do not have a right to have
24   standby, advisory, associate, or co-counsel.  Do you understand
25   that, sir?
```

```
1            THE DEFENDANT:  I understand that, Your Honor.

2            THE COURT:  While I will consider any requests that

3    you should make, you should not assume that I will appoint any

4    of those to represent you.  Do you understand that?

5            THE DEFENDANT:  I understand that, Your Honor.

6            THE COURT:  What access to books and other resources

7    do you have right now?

8            THE DEFENDANT:  I have -- I have access to the United

9    States Annotated Code for the relevant -- for the relevant

10   sections.  I have -- which I have printed and I have in my

11   possession.

12           I also have access to a law library at the prison,

13   which allows me -- allows me access to many things, including

14   the guidelines, the annotated codes, case law, and -- and jury

15   instructions.

16           THE COURT:  Do you understand, sir, that you will have

17   limited access to technology, books, or other resources?

18           THE DEFENDANT:  I do, Your Honor.

19           THE COURT:  While I will consider any requests that

20   may be made, you may be limted in determining which experts,

21   investigators, or others that might assist you in connection

22   with this case in locating experts or communicating with them.

23   Do you understand that?

24           THE DEFENDANT:  I do, Your Honor.

25           THE COURT:  Although you keep most of your rights when
```

1  you represent yourself, there is one right that you give up.

2  And that is you lose the right to claim on appeal that you had

3  ineffective assistance of counsel.  Do you understand that,

4  sir?

5        THE DEFENDANT:  I understand that, Your Honor.

6        THE COURT:  The Court will not advise you of any

7  further elements of the crime, of any possible defenses.  Do

8  you understand that, sir?

9        THE DEFENDANT:  I do, Your Honor.

10        THE COURT:  How old are you, sir?

11        THE DEFENDANT:  I am a 33-year-old, Your Honor.

12        THE COURT:  What is your physical health?

13        THE DEFENDANT:  Good, I believe.  Good.

14        THE COURT:  Do you have any medical problems?

15        THE DEFENDANT:  None.

16        THE COURT:  What is your mental health?

17        THE DEFENDANT:  Good.

18        THE COURT:  Are you taking any medication right now?

19        THE DEFENDANT:  None.

20        THE COURT:  When was the last time you took any type

21  of medication?

22        THE DEFENDANT:  About three months ago.

23        THE COURT:  What type of medication?

24        THE DEFENDANT:  A sleeping medication.

25        THE COURT:  To aid in your sleeping?

```
1              THE DEFENDANT:  Correct.
2              THE COURT:  Was that the only medication that you
3    took?
4              THE DEFENDANT:  Yes.
5              THE COURT:  Have you ever been diagnosed with or
6    treated for a mental illness?
7              THE DEFENDANT:  I have not.
8              THE COURT:  What is your understanding of the rules of
9    evidence, the rules of procedure, and the courtroom decorum
10   during the course of this trial?
11             THE DEFENDANT:  I believe I would -- good.  Good.
12             THE COURT:  When you say "good," how did you learn
13   what rules of evidence, rules of procedure, and courtroom
14   decorum is applicable in this case?
15             THE DEFENDANT:  The Federal Rules of Evidence are
16   applicable to this case.  The Federal Rules of Criminal
17   Procedure are also applicable to this case.  I believe the
18   local rules of decorum would apply.  I have not yet reviewed
19   them, but I do plan on reviewing them before the scheduled
20   trial commences, Your Honor.
21             THE COURT:  Has anyone forced you or threatened you to
22   make this decision, Mr. Muho?
23             THE DEFENDANT:  They have not, Your Honor.
24             THE COURT:  Are you making this decision to proceed
25   pro se on your own free will?
```

```
1              THE DEFENDANT:  I am, Your Honor.

2              THE COURT:  Is there any deficiencies by your

3     attorney, Mr. Harris, or any issue related to his

4     representation, that has an effect on your decision to proceed

5     pro se and represent yourself?

6              THE DEFENDANT:  None, Your Honor.

7              THE COURT:  Have you had a full opportunity to review

8     all of the discovery that the Government has provided to your

9     attorney, Mr. Harris?

10             THE DEFENDANT:  I have not yet had an opportunity to

11    review all the evidence, no, Your Honor.

12             THE COURT:  Was that provided to you by your attorney?

13             THE DEFENDANT:  Some of it was, yes.  And I reviewed

14    that -- those -- that -- the part that was provided.  Some, as

15    I understand, have not yet been provided by the -- by the

16    prosecutor.

17             THE COURT:  But all that has already been provided to

18    the prosecutor, was that given to you or shown to you by your

19    attorney, Mr. Harris?

20             THE DEFENDANT:  We've reviewed some of it, not all of

21    it, Your Honor.

22             THE COURT:  Mr. McLaughlin referred to voluminous

23    documents.  What format was the discovery provided,

24    Mr. McLaughlin?

25             MR. MCLAUGHLIN:  They were always provided on discs,
```

1  Your Honor.  Most everything on those discs is in PDF format.

2  If they are videos, they are the video files.

3       I would just let the Court -- remind the Court that

4  there is a protective order in this case.  So that might have

5  been some of the reasons why different attorneys weren't just

6  walking over to FDC and handing him discovery.  Given

7  Mr. Muho's conduct and the fraud charges in this case, and just

8  to allow the Government to provide discovery quickly, we didn't

9  redact all of the personal identifying information and account

10  information for all the records in this case.  And so there's a

11  strict protective order regarding discovery, which limits the

12  way counsel can share that information with the Defense and the

13  means it can be provided to a defendant.  And that's Docket

14  Entry 29, Your Honor.  So that might explain some of the

15  reasons why -- in terms of disclosure of discovery, Your

16  Honor --

17       THE COURT:  But that wouldn't answer whether in

18  fact -- I recognize there's a protective order.  But with

19  regard to the discovery that you have stated is voluminous in

20  nature, was all of the discovery provided on discs?

21       MR. MCLAUGHLIN:  Correct.

22       THE COURT:  How many discs?

23       MR. MCLAUGHLIN:  We're at 19.  Although sometimes the

24  discs have a lot more information than others.  Some might only

25  have a couple items.  Some might have -- you know, fill up the

```
 1    entire disc.  So each one is different.
 2              THE COURT:  And Mr. Muho, how are you able to review
 3    all of that discovery, the 19 discs?
 4              THE DEFENDANT:  Should I have possession of the 19
 5    discs, I believe at the prison where I'm currently held there
 6    is a computer which allows -- would allow me to review the
 7    discs, Your Honor.
 8              THE COURT:  Have you accessed the computer and
 9    reviewed any of this discovery?
10              THE DEFENDANT:  I have not yet had any of the discs in
11    my possession to date, Your Honor.
12              THE COURT:  So do you know the extent of the discovery
13    in this case?
14              THE DEFENDANT:  No, I do not, Your Honor.
15              THE COURT:  But your attorney has been provided all of
16    this discovery and you have yet to review it with your
17    attorney?
18              THE DEFENDANT:  We have reviewed -- my attorney has
19    provided me with some printouts of the relevant discovery -- of
20    some of the discovery, Your Honor.
21              THE COURT:  Mr. Muho, is it your intention to now
22    review these 19 discs containing this discovery between now and
23    the scheduled trial?
24              THE DEFENDANT:  That is correct.  That is my
25    intention, Your Honor.
```

1        THE COURT:  And you believe that between today's date,

2   which is Friday, February 3rd, and the scheduled trial in this

3   case, which is scheduled to take place --

4        MR. MCLAUGHLIN:  Your Honor, if I may.  In addition to

5   the 19 discs, there's also a two-terabyte hard drive that we

6   disclosed in discovery, which contains the mirror images of the

7   computers that were seized from the Defendant's New York

8   residence.

9        So in addition to the 19 discs, there's also this

10  two-terabyte hard drive that was provided to the Defense, and

11  that was when Sylvia Pinera-Vazquez was defense counsel.  It's

12  my understanding it's been provided to Mr. Harris, but that's

13  in addition to the 19 discs.

14        THE COURT:  Mr. Muho, how are you going to be able to

15  review these hard drives?

16        THE DEFENDANT:  I will not be able to review the hard

17  drives, I believe.

18        THE COURT:  So you recognize that there may be a

19  challenge between today, if the Court grants your request, and

20  the trial, which is scheduled to take place 18 days from today,

21  commencing on February 21st.  Is it your intention to seek

22  additional time in which to prepare for this trial?

23        THE DEFENDANT:  Your Honor, I believe because all the

24  evidence in the -- in the computers that were seized, I -- I --

25  it was -- they were my computers.  I'm already well aware of

```
 1   the evidence that -- so I -- I don't believe I would need
 2   additional time to review that evidence, though, knowing
 3   that -- being that I myself created that evidence so to speak.
 4          So I don't believe -- I believe -- I believe I can --
 5   and moreover, any additional time would still not allow me to
 6   be able to get access to a two-terabyte hard drive.  No amount
 7   of time would be able to actually allow me to get that.
 8          THE COURT:  Yet, your attorney, Mr. Harris, has the
 9   hard drives and has the capability of reviewing those hard
10   drives.  Correct, Mr. Harris?
11          MR. HARRIS:  That's correct, Your Honor.
12          THE COURT:  Do you understand that that will be an
13   issue with regard to your preparation for trial?
14          THE DEFENDANT:  I do, Your Honor.
15          THE COURT:  Is it your desire to request a delay of
16   this trial?
17          THE DEFENDANT:  It is not, my Honor -- it is not, Your
18   Honor.
19          THE COURT:  And the reason I ask you, sir, is the
20   Court received -- even though at the time, you were -- and you
21   are still are -- represented by Mr. Harris, a motion to dismiss
22   the Indictment with prejudice for violation of the Speedy Trial
23   Act.  Not addressing that motion, I want to ensure that you
24   understand that if you do not seek a continuance or a delay of
25   this trial in order to review to two hard drives and the 19
```

1    discs that the case will proceed to trial in 18 days.

2            THE DEFENDANT:  I do, Your Honor.

3            THE COURT:  And in telling the Court that you believe

4    that what's contained on the hard drives are documents you've

5    already seen, that's a huge assumption, Mr. Muho.  And you

6    would be proceeding to trial without having a full opportunity,

7    as Mr. Harris would have, to review each of those documents and

8    to discuss them with an independent individual who's competent

9    to represent you, such as Mr. Harris.  Do you understand that,

10   sir?

11           THE DEFENDANT:  I do, Your Honor.

12           THE COURT:  Do you still want to represent yourself,

13   sir?

14           THE DEFENDANT:  I do, Your Honor.

15           THE COURT:  Mr. McLaughlin, I would like you to advise

16   the Court whether there are any additional complexities to the

17   case that the Court is not aware of based on the discovery and

18   the witnesses that the Government seeks to present at trial.

19           MR. MCLAUGHLIN:  At this point, Your Honor, our

20   witness list is approaching 40-plus individuals.  Again, my

21   concern, though, is really with the protective order.  If you

22   look at Paragraph 4, prior defense counsel were required to

23   basically abide by this.  And that was to the extent that they

24   showed any of the discovery on discs to Mr. Muho, they had to

25   do it under defense counsel's direct and immediate supervision,

1   and B, then retain sole possession of the discs thereafter.

2          So now we're in a position where is Ms. Muho going to

3   have access to 19 discs full of personal identifying

4   information of numerous victims.  And one of our concerns is,

5   through our investigation, it's still unclear whether Mr. Muho

6   was acting alone or with other individuals.  And there's

7   evidence to suggest he was working with other individuals.  And

8   so from the Government's point of view, it's very much a

9   concern.

10          Secondly, I can tell the Court this:  In terms of the

11   two-terabyte hard drive, if the Court -- our concern,

12   especially on appeal or on a 2255, if Mr. Muho is going to go

13   pro se, which is his right, that he have adequate time to

14   review the evidence, especially review the digital evidence,

15   although he claims he knows what's on there.  The Government

16   would be willing to provide essentially a standalone hard drive

17   to allow him to essentially look through that evidence.  We

18   could have him go to one of the grand jury rooms here in the

19   courthouse, set aside time so he can look at it at least, so he

20   can review it.

21          So in terms of the complexities, there's complexities

22   on the PII side in terms of the protective order.  There's also

23   complexities on the side of the digital evidence as well.  So

24   given the fact he wants to now go pro se, the Government's a

25   little bit concerned in terms of going to trial in 18 days and

1   then facing these same issues on appeal or on a 2255.

2          THE COURT:  When is the last day of the speedy trial

3   period?

4          MR. MCLAUGHLIN:  I have not calculated that, Your

5   Honor.  I just got the motion right before we came over here.

6   I was going to respond to that tonight/tomorrow.  So I can

7   provide that via a filing tomorrow, but I haven't looked that

8   just yet.

9          THE COURT:  Are there any other unique complexities,

10  given the number of witnesses and the number of documents that

11  the Government will be presenting at this trial?

12         MR. MCLAUGHLIN:  Well, there's also the issues of --

13  the issue of exhibits in terms -- and typically, when I try

14  these cases, you have what I call a discovery conference where

15  you get together with opposing defense counsel and you show

16  them here are the exhibits, here are the ones that we have

17  marked; do you have any objection to them; can we get through

18  any sort of stipulations regarding ministerial matters.  That's

19  also going to pose a challenge with Mr. Muho proceeding pro se

20  as well.

21         And I haven't gone through -- at this point, Your

22  Honor, I haven't actually gone through how voluminous our

23  exhibit list is going to be, but it's going to be fairly large.

24         THE COURT:  Mr. Harris, based on your contact with

25  Mr. Muho, do you have any reason to believe that he might be

1    unable to carry out the tasks needed to present his own defense

2    without the help of counsel?

3           MR. HARRIS:  No, Your Honor.  I have no concerns of

4    him representing himself.  I wholeheartedly support his desire

5    to represent himself pro se.

6           THE COURT:  Well, then why don't we address -- if you

7    don't believe that there are any concerns, why don't you

8    address Mr. McLaughlin's concerns first related to the

9    protective order and secondly related to the voluminous nature

10   of the witnesses and the discovery in this case.

11          MR. HARRIS:  Well, I think myself as counsel would

12   have the same issues as Mr. Muho would have pro se.  The reason

13   why the motion was phrased as standby counsel was in part to

14   address maybe some of these concerns they have as far as

15   stipulations, other matters that may be too difficult for the

16   Government and Mr. Muho proceeding pro se to facilitate on

17   their own.  That was the purpose of the request from my point

18   of view.

19          THE COURT:  And with regard to the protective order,

20   sir?

21          MR. HARRIS:  I don't have much to add as to the

22   protective order.  I think the issues still stand.  Whether I

23   represent Mr. Muho or he does it on his own, I think the issues

24   will still remain.  Leave it to the Court to decide what's best

25   to proceed going forward as to that issue.

```
1        THE COURT:  And with regard to the hard drives, have

2   you looked at all of the digital evidence?

3        MR. HARRIS:  I am about 90 percent complete.  The

4   reason why I still have them in my possession is there is an

5   outstanding order by the Court in relation to a request that my

6   office made for electronic discovery, which was objected to by

7   the Government.

8        In response, Your Honor, in an order, requested that

9   my office first determine how many of the requests within my

10  motion have been already provided, which requires me now to go

11  through all the electronic information to first determine if

12  any of it has already been provided, and then address the

13  relevance.  We're almost complete.  My intention was at that

14  point to share with Mr. Muho our review and let him take it

15  from there.

16       THE COURT:  And of the 90 percent of the documents on

17  the two hard drives that you have reviewed --

18       MR. HARRIS:  Right.

19       THE COURT:  -- is Mr. Muho accurate that all of those

20  documents are his documents?

21       MR. HARRIS:  I would say no.  But I think he has an

22  awareness of the nature and the substance of the documents at

23  issue.

24       THE COURT:  But that wasn't what Mr. Muho assumed.  He

25  assumed that the documents contained on the standalone hard
```

1    drives were his documents.  Are they all his documents?

2            MR. HARRIS:  They are not all his documents.

3            THE COURT:  Do you believe that that would be an

4    impediment to Mr. Muho preparing for trial?

5            MR. HARRIS:  No.  I don't think so at all.

6            THE COURT:  How do you believe that Mr. Muho would be

7    able to review the documents on the two hard drives?

8            MR. HARRIS:  I will facilitate the entire file

9    personally and bring it to him so he has adequate time to

10   review the entire file, which means tomorrow.

11           THE COURT:  So when you say "facilitate," you would

12   bring the hard drives to where Mr. Muho is housed?

13           MR. HARRIS:  He's housed right nextdoor, Your Honor,

14   yes.  So I'll be here tomorrow.

15           THE COURT:  Do you know that there's a capability for

16   Mr. Muho in custody to review these hard drives?

17           MR. HARRIS:  My intention was actually to bring him

18   paper copies of what I deemed relevant documents from the

19   electronic and provide him the discs, so he can look at other

20   documents, and sit down with him and share with him my views of

21   what has been turned over and then let him decide for himself

22   thereafter how he wishes to proceed in his own behalf.

23           THE COURT:  Mr. Harris, are you ready to proceed to

24   trial on February 21st?

25           MR. HARRIS:  I am not because Mr. Muho has indicated

1    to me that he desires to go forward without my participation.

2              THE COURT:  Prior to his motion being filed, would you

3    have been ready to proceed to trial, given the discovery that's

4    provided?

5              MR. HARRIS:  I think I could have gone forward, yes.

6    But it's not Mr. Muho's desire for me to do that, and I will

7    respect his decision and allow him, if the Court permits him,

8    to do it on his own behalf.

9              THE COURT:  And given the number of witnesses and the

10   nature of the discovery, do you believe that Mr. Muho would be

11   prepared to proceed to trial on February 21st?

12             MR. HARRIS:  I do, Your Honor.  I believe he's

13   thoroughly familiar with all the issues raised and can

14   adequately defend himself in the proceedings at the appropriate

15   time on the 21st.

16             THE COURT:  And are there any physical or mental

17   health issues that you're aware of that would be an impediment

18   to Mr. Muho representing himself?

19             MR. HARRIS:  No.  I'm not aware of any, Your Honor.

20             THE COURT:  Mr. Muho, is it still your desire to

21   exercise a constitutional right and represent yourself at the

22   time of trial?

23             THE DEFENDANT:  It is, Your Honor.

24             THE COURT:  The Court finds that the Defendant has

25   voluntarily, knowingly, and intelligently waived the right to

1    be represented by an attorney, with a full understanding of

2    that right.  And the Court finds that the Defendant, Mr. Muho,

3    is competent to represent himself and grants the Defendant's

4    pro se status.

5         THE DEFENDANT:  Your Honor, may I make a motion for

6    Mr. Harris to serve as my co-counsel in this case and assist me

7    through the trial, whether by providing me documents and

8    information that I need or to assist me in either direct

9    examination of myself in this case or others, and

10   cross-examine, and opening and closing statements in this case?

11        THE COURT:  Mr. Muho, the Court exercising its

12   discretion to appoint standby counsel is not for the purpose of

13   allowing that attorney to take over your case.  The Sixth

14   Amendment requires that you, as deciding that you want to

15   proceed pro se, be allowed to control the organization and

16   content of your defense.

17        So what specifically would Mr. Harris be performing in

18   this case as opposed to you yourself?

19        THE DEFENDANT:  He would be -- he would be -- he would

20   be taking the documents that -- any motions and any filings

21   that I would make in this case and file them with the Court in

22   an organized format.  So --

23        THE COURT:  I'm sorry.  Let's take that one at a time.

24   He would be taking the documents, any motions and any files

25   that you would make in this case and file them with the Court

```
1    in an organized format.  That doesn't make any sense to me.

2    What specifically would Mr. Harris be doing in this case?

3              THE DEFENDANT:  Should I need to file any written

4    motions with the Court, Mr. Harris would receive the written

5    motions in either a hand format -- handwritten format or by --

6    via email and he would prepare a motion with the Court on my

7    behalf that I would then sign and file with the Court that --

8    that -- that -- that -- that would meet the criteria of

9    normally filed motions with this Court.

10             THE COURT:  Other than written motions that would be

11   under your direction to file, what else would Mr. Harris be

12   doing?

13             THE DEFENDANT:  He would -- he would -- he would

14   contact and ensure that all the -- any and all subpoenas that

15   I -- that I would be requesting would be -- would be -- the

16   documents received would -- I would actually be -- that all the

17   documents produced from the subpoenas would be received by me

18   to allow me to prepare for the defense.  And also he would

19   contact -- and just -- he would -- he would -- he would contact

20   witnesses and -- and schedule all witness -- all witness

21   scheduling for the -- for trial.

22             THE COURT:  Anything else?

23             THE DEFENDANT:  The last thing that I would ask would

24   be that he may help me in -- in telling -- telling my defenses

25   to the jury during trial -- at times during trial.
```

```
1              THE COURT:  In what format, sir?

2              THE DEFENDANT:  In -- be it -- he would help me ask

3     questions and help -- well, he would ask me questions that I

4     would prepare for him to ask me that would allow me to lead and

5     tell the jury my defenses in a -- in a -- in a structured

6     manner.

7              THE COURT:  Anything else?

8              THE DEFENDANT:  That's -- that's all I can think of

9     right now, Your Honor.

10             THE COURT:  So what would your participation be from

11    this point forward, sir, representing yourself?  What would you

12    be doing?

13             THE DEFENDANT:  I would be -- I would be preparing my

14    defenses, preparing any motions -- any substantive motions and

15    preparing for any motions that I need to file during trial and

16    also prepare for my -- my -- structure my defense and -- my

17    defenses for the jury, put together evidence, and a

18    presentation for the jury.  That would be my job, I think.

19             THE COURT:  So you would be cross-examining the

20    Government's witnesses, if you choose to?

21             THE DEFENDANT:  Correct, Your Honor.

22             THE COURT:  And you would be making an opening

23    statement?

24             THE DEFENDANT:  Correct, Your Honor.

25             THE COURT:  And you would be giving any closing
```

1    argument?

2           THE DEFENDANT:  Correct, Your Honor.

3           THE COURT:  Mr. McLaughlin?

4           MR. MCLAUGHLIN:  Two things, Your Honor.

5           In terms of Mr. Harris serving as standby counsel, I

6    want to bring this to the Court's attention because it troubles

7    me.  In Mr. Muho's motion to dismiss the Indictment in

8    violation of the Speedy Trial Act -- and again, I reached out

9    to Mr. Harris if he actually signed this motion and the

10   declaration, but on the last two pages there's a declaration

11   and it essentially says that -- and it swears under penalty of

12   perjury that:  "Since my involvement in this action, the

13   Government lawyer, Brittain Shaw" -- and I'll let the Court

14   know Brittain Shaw is a DOJ fraud attorney based out of

15   Washington, DC -- "has repeatedly contacted me to gain the

16   cooperation of Mr. Muho in its parallel prosecution of Alphonse

17   Fletcher.  Brittain Shaw has consistently referred to Fletcher

18   as," quote, "the target of the," quote, "entire case."

19          I reached out to Ms. Shaw because this concerned me.

20   She's willing to swear an affidavit saying that is patently

21   untrue.

22          The second paragraph below that is also states:  "In

23   my discussions, I have inquired about the Government's delays

24   in responding to discovery and in taking the case to trial.

25   Sean McLaughlin," me, "has responded that he," quote/unquote,

1    "is really interested in Fletcher.  He generally glosses over

2    the discovery and continuance issues."  That is patently

3    untrue, Your Honor.

4           I've also informed that -- those facts to Mr. Harris

5    via email.  So I don't know whether Mr. Harris is signing these

6    pleadings or these are Mr. Muho pleadings that he's forging

7    Mr. Harris' signature.  I can tell you this:  This declaration

8    is patently false.

9           And so in terms of Mr. Harris' answers regarding

10   whether he would be ready to go to trial, Mr. Muho's ability

11   and readiness to go to trial, the Government has grave

12   concerns, Your Honor.

13          Secondly --

14          THE COURT:  All right.  Well, certainly, Mr. Harris --

15   I'm sorry.  I apologize.

16          Mr. McLaughlin?

17          MR. MCLAUGHLIN:  In terms of motions, if the Court is

18   going to go to trial on February 21st, the Government will be

19   ready.  But given Mr. Muho's nature -- litigious nature -- if

20   you look at his civil pleadings, what the Government is

21   concerned about is there will be a flood of pro se pleadings in

22   this case, which makes preparing for trial almost impossible

23   from my end because I'm going to be up till 1:00 in the morning

24   responding to motions.

25          If, in fact, we're going to have a trial date of the

1    21 or if we have one afterwards, I would ask the Court

2    specifically for a -- essentially a motions calendar of no

3    motions beyond this date, all motions must believe filed by

4    this date, responses by this date, just to give me time and my

5    witnesses and my agents time to actually prepare witnesses and

6    get exhibits together.

7          And I had one other thing, but I forget.  But those

8    are the two main concerns.

9          THE COURT:  All right.  Well, why don't we take up

10   each issue in turn.  I'm certain that, Mr. Harris, as an

11   officer of this court, a member of the Florida Bar, recognizes

12   his ethical obligation, as well his professional obligations,

13   to ensure that any document that he signs he has a good-faith

14   basis to do so.  That is with regard to issues of law or issues

15   of fact.

16         So Mr. Harris, with regard to --

17         MR. HARRIS:  Yes, Your Honor.

18         THE COURT:  -- Page 12 of Docket Entry 99, is that

19   your signature, sir?

20         MR. HARRIS:  That is, Your Honor, and I stand behind

21   it.

22         THE COURT:  Is this affidavit and declaration your

23   declaration?

24         MR. HARRIS:  That is my declaration with my signature,

25   yes.

```
 1            THE COURT:  All right.  Then for purposes of this
 2     motion to dismiss, which the Court is going to set a schedule
 3     as soon as we have addressed this issue --
 4            MR. HARRIS:  Right.
 5            THE COURT:  -- the Court will address it when the
 6     Court hears the motion to dismiss.  So Mr. Harris understands
 7     he has an ethical and a professional obligation, and I'm
 8     certain that he does not want to risk his privilege to practice
 9     not only in the Southern District, but in the state of Florida,
10     by signing something that he does not believe to be true.  So
11     we will address those factual issues at the appropriate time.
12            MR. HARRIS:  Thank you, Your Honor.
13            THE COURT:  But addressing the request for standby
14     counsel, Mr. Muho, the Sixth Amendment does not guarantee a pro
15     se Defendant the right to participate as co-counsel.  And as
16     such, any hybrid representation would be disallowed.  That is,
17     that you would conduct certain portions of the trial and
18     Mr. Harris would conduct certain portions.  I will not allow
19     that.  However, standby or shadow counsel to the extent that
20     Mr. Harris' actions are actions to assist the Defense in this
21     case outside the presence of the jury, that would include
22     written motions, the issuance of subpoenas, the conversations
23     with witnesses to properly prepare you for trial, the
24     scheduling of any witnesses and preparing questions at counsel
25     table for you to ask during any cross-examination that you
```

1    choose to undertake, the Court will allow.

2            I certainly want to caution you, sir, that by

3    proceeding pro se you have no greater rights than a litigant

4    who is represented by an attorney and the Court is under no

5    obligation to become an advocate for you to assist you and to

6    guide you.  And if there are rules that are not followed, both

7    within the presence of the jury and outside the presence of the

8    jury, the Court will admonish you if you do not follow those

9    rules.

10           So I want to advise you there are no questions to ask

11   of the Court with regard to any direction to be given.  You

12   have made the decision and the Court has made the finding that

13   you are competent and you are capable of representing yourself,

14   understanding the significant dangers and the disadvantages of

15   proceeding to trial.  But I want to make clear that while the

16   Court will allow Mr. Harris to be shadow or standby counsel,

17   that the introduction of evidence, the objecting to testimony,

18   compliance of the rules of court, protocol, and procedure are

19   obligations that you have; however, Mr. Harris' participation

20   will be to assist you, but must not be intrusive so as to

21   destroy the jury's perception that you are representing

22   yourself.

23           Is that understood, Mr. Harris?

24           MR. HARRIS:  Yes, Your Honor.

25           THE COURT:  Is that understood, Mr. Muho?

 1          THE DEFENDANT:  It is, Your Honor.  Thank you.

 2          THE COURT:  Before the Court are several motions;

 3     however, only one is to be addressed today, as we have

 4     addressed the one regarding a pro se representation, and that

 5     is the motion to set a reasonable bond.

 6          Mr. Muho, as I advised you when we first began this

 7     afternoon, there is a bond and that was already set.  So the

 8     Court can certainly deny this as moot.  If the Court addresses

 9     this, then the Government does have the right, specifically

10     pursuant to law, 18, United States Code, Section 3142, for a

11     pretrial detention based on a claim of risk of flight and

12     danger to the community and we would proceed to hearing.

13          Are you seeking to have the Court modify the bond that

14     was set by Judge Hunt in this case?

15          THE DEFENDANT:  I am requesting that -- I'm requesting

16     that -- I am requesting that the Court modify bond to a

17     reasonable -- to a reasonable bond.  And I am also requesting

18     that that reasonable bond be modified based upon a bond

19     hearing, which was not previously held in the case, which would

20     include a review of the evidence in the case and -- before

21     setting of a bond, whereas the original bond was set by

22     agreement of the parties at the time without -- without a bond

23     hearing having been conducted.

24          THE COURT:  Mr. McLaughlin, is the Government moving

25     forward on its motion to detain Mr. Muho pretrial?

1          MR. MCLAUGHLIN:  We are, Your Honor.  And I could

2     proceed by proffer.  Again, there's an affidavit in the record.

3     There are the allegations in the Superceding Indictment in the

4     record.  I can supplement that with additional facts or I can

5     read essentially from the affidavit and have that come into the

6     record.

7          How would you like the Government to proceed, Your

8     Honor?

9          THE COURT:  Well, at this point, with regard to the

10    agreement that was made by the parties, it would appear the

11    agreement was made after discussions between counsel relating

12    to what both sides agreed was reasonable.  I do not know the

13    circumstances of the Government's contention that Mr. Muho is a

14    risk of flight or danger to the community.  So certainly you

15    may proceed and the Court will have the benefit, since Mr. Muho

16    has now requested that the Court revisit the setting of the

17    bond.

18         MR. MCLAUGHLIN:  Certainly, Your Honor.

19         The Government's going to proceed by proffer.  The

20    case agent is here in case Mr. Muho wants to cross-examine him

21    about the Government's case, but permission to proceed by

22    proffer.

23         THE COURT:  Certainly.

24         MR. MCLAUGHLIN:  Thank you.

25         Your Honor, starting in around June 2012, Mr. Muho was

employed by Fletcher Asset Management and its related affiliates in New York, New York.  Fletcher Asset Management being "FAM."

FAM had numerous related entities and subsidiaries, including, but not limited, to RF Services, Fletcher Funds, Richcourt Funds, Soundview Elite Limited, Vanquish Fund, FI Cobalt, and FI Investments.

Based on witness interviews and other investigation, law enforcement learned that Mr. Muho, during late 2002, copied and retained the company's server files, which contained voluminous personal and financial identifying information of FAM employees, clients, subsidiaries, and others.

During in and around April of 2013, Mr. Muho was fired from FAM and he was removed from all associated boards of directors and bank accounts.  Upon being terminated, Mr. Muho refused to return the copy of the company server's files.  And I can let the Court know during May of 2016, law enforcement executed a search warrant at Mr. Muho's Ridgewood, New York residence and recovered what we believe to be the actual FAM company server files.  They are so voluminous, we still haven't gone through them.  But I want to let the Court know.

And based on the entities and real person victims involved in Mr. Muho's fraudulent activity, as charged in the Superceding Indictment, there is ample evidence to show that Mr. Mujo unlawfully copied, retained, and utilized personal and

1    financial identifying information of FAM employees, clients,

2    and other individuals and entities associated with his former

3    employer.

4            After being fired from FAM, Mr. Muho began to

5    fraudulently attempt, via forged corporate documents, to obtain

6    multimillion dollar amounts from FAM's subsidiaries.  On or

7    about August 9th, 2013, Mr. Muho falsely and fraudulently

8    obtained approximately $2,067,377.24 via an overseas wire from

9    Soundview Elite's HSBC Monaco account.  Mr. Muho was able to

10   quickly transfer approximately $1.6 million of these funds to

11   various other bank accounts under his control and without

12   detection.  Thereafter, he was successfully sued in the

13   Southern District of New York, in Case Number

14   13-6895-cv-Torres.  The Plaintiffs were able to obtain a

15   default judgment and freeze approximately $400,000 remaining in

16   one of Mr. Muho's Citibank accounts.

17           What I can also let the Court know, in and around May

18   of 2013, after he had been fired, Mr. Muho then started

19   establishing a series of shell or sham companies, some of their

20   names which come up in this case are Leveraged Hawk, Inc., GM

21   Capital Management, and Acacius, LLC.

22           Starting in and around September of 2013, the evidence

23   in this case typically shows that Mr. Muho moved down to

24   Florida -- South Florida in and around June 2013.

25           During September of 2013, Mr. Muho utilized a portion

1    of the -- we'll call them FAM fraud proceeds -- to make a cash

2    purchase of a condo located at 1100 Biscayne Boulevard,

3    Apartment 5303, here in Miami, Florida, for approximately

4    $775,000 in cash.

5          During November of 2014, Mr. Muho, in the name of GM

6    Capital Management and Gerard Morgan, applied for a $500,000

7    loan on the residence with CM Investments, LLC.

8          Among other material misrepresentations, Mr. Muho,

9    while posing as the alias Gerard Morgan and utilizing a bogus

10   Social Security number, told -- on the application claimed that

11   he earned $40,000 per month and had worked at GM Capital for

12   approximately three years.

13         On or about November 26th, 2014, CEM approved the loan

14   and wired approximately $453,710 to the closing agent in South

15   Miami, Florida.  Thereafter, the closing agent issued three

16   checks to Mr. Muho, totaling approximately $380,000.  And

17   what's also important for the Court to know, during the

18   application process, in addition to lying about his identity,

19   and how much money he made, and where he worked, Mr. Muho also

20   made representations in terms of what he would use the fraud

21   proceeds for -- excuse me -- loan proceeds.  He told CEM that

22   he'd be using them for business purposes and he also told CEM

23   that the condo at 1100 Biscayne was not his primary residence.

24         And back to where I was before.  The closing agent

25   issued three checks to Mr. Mujo, totaling $380,000.

1    Thereafter, Mr. Muho quickly deposited these funds in a JP

2    Morgan Chase account, and a review of this account revealed

3    that approximately four months later he had spent and utilized

4    most, if not all, of these fraud proceeds for shopping,

5    gambling, and travel.  Thereafter, Mr. Muho defaulted on the

6    loan, the lender foreclosed, sold the residence, and the new

7    owners took possession.

8          On or about February 16th, 2016, the lawyer for the

9    new owners, Ms. Alexis Read, and the Miami-Dade Police

10   Department, utilizing a court-ordered writ of possession,

11   arrived at the Miami residence to formally evict the Defendant.

12   They discovered that he had abandoned the unit, but left behind

13   a series of fraudulent bogus identification documents, Social

14   Security cards, driver's licenses, ID cards, fraudulent checks,

15   financial statements, credit cards, debit cards, and other

16   fraud items.  Ms. Read found these items to be criminal in

17   nature, and that was readily apparent.  She contacted the

18   Miami -- City of Miami Police Department, who took custody and

19   control of these items.

20          I would let the Court know that of the items that were

21   seized from the condo, many of the real person victims charged

22   in the Superseding Indictment -- their personal information was

23   in his condo.

24          During February of 2015, Mr. Muho, posing as, again,

25   Gerard Morgan, applied for a vehicle loan in Miami, Florida,

1    for approximately $30,000.  He applied for the loan with Space

2    Coast Credit Union, which is a financial institution, to

3    purchase an orange 2015 Jaguar.  As part of the transaction, he

4    traded in a Maserati vehicle that he earlier had purchased with

5    approximately $107,000 in the HSB Monaco fraud proceeds.

6         As part of his loan application, Mr. Muho made a

7    series of material misrepresentations, including that he was,

8    quote, president and attorney of GM Capital Management and that

9    he earned $220,000 per year.  He utilized a bogus Social

10   Security number, provided two fraudulent and bogus W2 and IRS

11   1099 documents for GM Capital and Leverage Hawk with the same

12   fake Social Security number.  He also provided a

13   fraudulently-obtained Massachusetts driver's license, with his

14   own photograph, in the name of Gerard Morgan.

15        Based on the material misrepresentations, Space Coast

16   funded the loan.  Ultimately, Mr. Muho stopped making payments

17   and the loan went into a default.

18        Beginning in and around September 2015, Mr. Muho, in

19   this district, falsely and fraudulently submitted various bank

20   applications and related documents to open approximately nine

21   different bank accounts in this district.  Those included Wells

22   Fargo, PNC Bank, Bank of America, and TD Bank, all financial

23   institutions.  Mr. Muho was captured on bank surveillance video

24   opening various accounts and attempting to cash and deposit

25   various false and fraudulent checks.  In total, the bogus

54

1     checks totaled about $77,000.

2          During this time, the evidence is also overwhelming

3     that Mr. Muho unlawfully utilized the personal financial and

4     personal identifying information of a variety of real person

5     victims.  Those victims include TDV, MM, among others.

6          On or about October 8th, Your Honor, Mr. Muho, posing

7     as victim TDV, electronically submitted an online loan

8     application via the Internet for $35,000 with Upstart Network

9     and Cross River Bank.  Mr. Muho falsely and fraudulently

10    utilized victim TDV's name and Social Security number.  He also

11    submitted a bogus Ohio driver's license in TDV's name with the

12    Defendant's photograph, including an altered Wells Fargo

13    account in TDV's name.

14         I can just say during our investigation, what you see

15    every time Mr. Muho is posing as victim TDV, he actually has a

16    series of different fraudulent driver's licenses from different

17    states for different victims, but with his name on them.  And

18    what we learned through our investigation is -- especially on

19    the computers that were seized from Mr. Mujo's New York

20    residence, is you actually see him posing with photographs of

21    himself with these actual IDs.

22         Subsequent investigation as to the Upstart loan, Your

23    Honor, revealed that the IP address on the application was

24    registered to Hotwire Internet Service at Mr. Muho's Miami

25    condo on Biscayne.

1          During November of 2015, Mr. Muho made various

2    attempts to falsely and fraudulently obtain a number of student

3    loans through Sallie Mae Bank, also a financial institution.

4    On or about November 24th, Mr. Muho, posing as victim MHG,

5    electronically applied to Sallie Mae via the Internet for a

6    student loan in the amount of $30,000.  The IP address captured

7    on that loan was registered to his Internet account at Hotwire

8    at his Miami condo.  MHG was the purported cosigner on this

9    loan.  Among other material misrepresentations, Mr. Muho

10   claimed that -- excuse me -- victim JMR attended UC Berkeley

11   Law School, like he did, and he also utilized a bogus Social

12   Security number JMR.  As to victim MHG, he provided victim

13   MHG's real Social Security number and also other personal

14   identifying information.

15          On or about December 15th, 2015, Mr. Muho, posing as

16   the alias Kris J. Blair and victim MHG as the cosigner,

17   electronically applied to Sallie Mae for another loan.  This

18   time in the amount of $15,000.  The IP address captured by

19   Sallie Mae registered back to his Miami condo.  Mr. Muho listed

20   victim MHG as the cosigner and used the alias Kris Blair.  And

21   during our investigation, what we learned is Mr. Muho utilizes

22   a series of different aliases.  There's real person victims and

23   actual aliases.  Some of the aliases he has used include Kris

24   Blair, Enton Pinguli, among others.

25          On this loan application, he claimed that,

1   quote/unquote, Kris Blair graduated from UC Berkeley Law School

2   and was earning $180,000 a year at the company Grower, Blair &

3   Co.  Mr. Muho fraudulently utilized a bogus Social Security

4   number for Mr. Blair and provided MHG's real Social Security

5   number and other personal identifying information.

6          Again, in this case, Your Honor, for all of the real

7   person victims we've contacted, none these people provided

8   Mr. Muho with authority to use their name, Social Security

9   numbers, their dates of birth, or anything of that nature.

10          On or about January 9th, Sallie Mae approved the loan

11   and issued two checks for $15,000, which were mailed to

12   Ridgewood, New York, the same address where Mr. Muho was

13   arrested in May.  Those were deposited by Mr. Muho into two

14   separate bank accounts.

15          On January 26th, 2016, Mr. Muho was arrested by the

16   Miami-Dade Police Department at Amscot Financial, here in

17   Miami, attempting to obtain payday loans fraudulently.

18   Mr. Muho was posing as real person victim MHG.  Upon arrest,

19   law enforcement seized a bogus Florida driver's license in the

20   name of MHG, with Mr. Muho's photograph.  They also seized

21   bogus paystubs purporting to be from, quote, Ball Four

22   Investors, in the name of the victim MHG.

23          In that case, Your Honor, Mr. Mujo received a bond and

24   was released approximately one day later.  He was charged with

25   Florida felony violations forgery, grand theft, and identity

1   theft in Miami-Dade Case Number F16-001748.  A review of the

2   docket reveals that Mr. Muho essentially fled the district and

3   on February 25th, 2016 a warrant was issued for his arrest,

4   which remains outstanding.

5           THE COURT:  Can you give me the date that the arrest

6   remains outstanding.

7           MR. MCLAUGHLIN:  The arrest occurred on January 26th.

8   The warrant was issued on February 25th, 2016.

9           THE COURT:  Thank you.

10          MR. MCLAUGHLIN:  There are other facts that support,

11  Your Honor, the finding that by a preponderance of the evidence

12  Mr. Muho is a flight risk and also a danger to the community.

13  I would -- I've included some of those in my response.  I can

14  go into greater detail with them, but the most glaring and

15  troubling from the Government's perspective is, A, his failure

16  to attend court hearings.  He's been held in contempt.  He's

17  violated court orders repeatedly.

18          Just as troubling is when Mr. Muho was arrested in New

19  York, what they found in his vehicle was essentially a

20  photocopy of a fraudulent US passport with one of our victims.

21          Upon going through his computers that were, again,

22  seized from his New York residence, he has a series of

23  fraudulent passports in the names of various victims.  Again, I

24  told the Court earlier, our investigation -- there is evidence

25  to suggest that there are others involved in his scheme.  We

1    don't have the actual passports -- these fraudulent passports.

2    We haven't been able to find them.  We don't know who has them.

3    But clearly, Mr. Muho has the ability to create fraudulent

4    travel documents, and that's a concern for the Government.

5         I would also note for the Court that Mr. Muho is

6    facing substantial imprisonment if convicted in this case.  My

7    estimation of the guideline range has him at 20-plus years if

8    all the enhancements apply.  That is another reason why he is a

9    risk of flight.  He has no property here.  The only property he

10   has ever owned was foreclosed on and he was evicted from, which

11   he fought tooth and nail all along the way.  He has no ties

12   here.  He has no family here.  He has no friends here.  He has

13   never worked here.

14        A review of various state databases in New York and

15   here is since 2012, when he was fired at FAM, he has never held

16   a legitimate job, Your Honor.  In fact, when he was fired, he

17   briefly got unemployment from the State of New York at the same

18   time he was telling all of these lenders and other people that

19   he was making $40,000 a month.  So that's another concern.

20        For those reasons, Your Honor, in addition to the

21   documents and exhibits we have submitted, there is more than

22   enough evidence to find beyond a preponderance of the evidence

23   that Mr. Muho is a flight risk.  And also there is clear and

24   convincing evidence that he's a danger to the community and the

25   victims, economic and otherwise.

```
1              THE COURT:  Mr. Muho?

2              THE DEFENDANT:  Your Honor, there's a lot to respond

3    to here.  There is a lot to respond -- and I'm glad I'm finally

4    being given the chance here to do so.

5              This case -- and I'll just start summarizing it before

6    I start doing some cross-examination here, but this case is --

7              THE COURT:  There are no witnesses, sir.  I just need

8    to hear an argument from you.

9              THE DEFENDANT:  Okay.  This case is -- is -- the

10   prosecutor here -- what he does -- what it amounts to is

11   Mr. Muho unlawfully obtained $2 million, he borrowed from CEM,

12   and he had a lot of fake IDs.  But what are the fake IDs?  What

13   are all these passports?  What do all this voluminous

14   evidence -- what do any of these look-bad evidence -- what do

15   any of these things have to do with the $2 million that was

16   obtained that he claimed was unlawful?  He hasn't said one

17   thing about that.  What was fraudulent?  What was materially

18   false or a misstatement?  Not one thing.  And also not a thing

19   to do with the CEM loan.  Of course, it's also not a CEM loan

20   at all.

21             He doesn't -- there is no proof that a fake ID was

22   used there at all.  They call it a bogus ID.  They call it a

23   bogus ID.  They call it a fake social, but it's a real ID.  It

24   was a -- it's as real as anybody else's ID.

25             I -- these -- it's unfortunate that they lie and they
```

1   have been keeping me for nine months on -- on -- on -- on --

2   on -- on accusations of -- of -- of -- that are baseless.  He

3   sent me for a mental evaluation on wholly irrelevant grounds,

4   as a doctor found, not me.

5          So let's -- let's address everything -- everything

6   step by step.  In 2013 -- by the way, first and foremost, there

7   is no count -- I've looked through the Indictment.  I've looked

8   through the first one, the second one.  There is no count that

9   I can find that charges me with false -- with stealing $2

10  million.  I'll just call it stealing.  There is no count.

11  There is one count, which is Count 18, and I believe that's the

12  count that charges me with wire fraud affecting a financial

13  institution for in excess of a million dollars.

14         Count 18, as I read it -- as everybody would read

15  it -- says that I submitted a loan application to Upstart Bank

16  in 2015 using false and fraudulent information.  I don't know

17  what's fraudulent, but let's assume that that's the case.  What

18  does that have to do with the $2 million that he claimed -- or

19  that he claimed were the proceeds that spurred my -- my -- my

20  fraud -- that he calls fraud?  I mean, it's easy to just call

21  it fraud.  But what was so fraudulent about it?  What does that

22  have to do -- even if there was -- well -- sorry about that.

23  It's my fist time defending myself in a criminal case.

24         But even if there was fraud on that New York

25  transaction, which there wasn't, he hasn't shown any.  He just

```
1    said that I was fired as a director.  I don't know how you get
2    to be fired as a director.  But he hasn't said what was
3    fraudulent about it, what was false, what was anything.  But
4    even if it was, he -- there's -- this Court lacks the complete
5    jurisdiction over that matter because that transaction occurred
6    entirely in New York.  I was in New York.  The mere visit -- a
7    mere visit of my mine in June of 2013 on unrelated matters does
8    not give this Court jurisdiction over that $2 million fraud.
9    Although there was, again, nothing fraudulent about that.
10        I am the SEC-registered -- which he neglects, I assume
11   he just forgets to mention that I am the SEC-registered
12   investment advisor of -- of -- of -- of the -- of the -- of the
13   funds where the money came from.  Well, that means that I'm the
14   only person responsible for those funds.  And only using that
15   real information, which is registered with the SEC, which is
16   registered the IRS, that's where the money came from.  It
17   wasn't -- it was -- there was, again, no false, no
18   fraudulent -- again, I have to get used to this.  But I
19   apologize if I'm coming off rambling on it all.
20        And yes, some of those funds were used to buy the
21   property -- the property, which was later stolen.  Apparently,
22   I fought tooth and nail.  Well, he neglects to mention that I
23   was excluded by court order from fighting that from -- from --
24   from -- from that judgment.  I've -- I've put in a motion for
25   suppression -- my attorney has -- which further goes forth, you
```

```
1    know, in that.

2         I have -- so then, I'm -- so the first transaction has

3    nothing to do with -- and then CEM, again, real ID, real

4    information, and no fraud.  He doesn't allege fraud.  He just

5    alleges, well, a year later, when CEM foreclosed on the loan,

6    they found fake IDs.  What does that have to do with the

7    original mortgage, when the legal ID and the real information

8    was used?  And what does CEM -- the bank, he so-called, because

9    it has to be a bank.  It has be a financial institution.  Well,

10   CEM is none of those.  The only thing they did was steal my

11   loan.  They're not a financial institution.  They're not a

12   bank.  There's not a single proof that it's FDIC -- that it

13   holds FDIC deposits.  They don't show any of that, but they've

14   kept me in jail here for nine months based on claiming CEM was

15   the original lender.

16        Well, what does that --

17        MR. MCLAUGHLIN:  Your Honor, I'm going to object in

18   terms of the focus of this hearing is whether or not Mr. Muho

19   is a flight risk and whether he is a danger to the community.

20        THE COURT:  That's correct.

21        THE DEFENDANT:  But, Your Honor, notwithstanding,

22   because as -- part of the argument that the prosecutor makes is

23   that I'm a flight risk because I face significant imprisonment.

24   Given that I am able to show that CEM -- there was no -- there

25   is no evidence to show any wrongdoing for the main count, Count
```

```
 1    Number 1.  And for the uncharged count, the $2 million count,

 2    Count 2 to 37, I face -- I face -- expose me to at max

 3    three-year prison -- a three-year prison sentence under the

 4    guidelines.

 5         So for me to address the CEM count and the uncharged

 6    count, I believe, is very relevant to my -- to the flight risk

 7    that I pose.  Because if I face no flight risk -- if I face no

 8    significant -- and I've already done a year -- if I face no

 9    significant imprisonment, then I would not be, you know -- you

10    know, trying to flight, which is completely baseless, almost as

11    baseless as him sending me for a mental evaluation.

12         THE COURT:  Do you want the address the basis of your

13    motion, sir?

14         THE DEFENDANT:  Okay.  So Your Honor, this is -- I --

15    I -- I -- I'm asking for bond.  I'm asking for bond and I'm

16    asking for -- to be held for electronic monitoring, for home

17    arrest, whatever is necessary.  The only thing that I'm trying

18    to do is to be able to fight this case properly.  I have much

19    invested in this case.

20         I have -- upon winning this case, I would be able to

21    get my home back or at least begin the process, which this case

22    has prevented me from doing.  I would be able to reestablish

23    myself -- I would be able to reestablish myself as the

24    SEC-registered investment advisor of funds with 120 million in

25    assets, which has been stolen from me and continues to be
```

1   stolen from me.  Because of this case, I am unable to do

2   anything to prevent other people's misdoings, at my expense,

3   ever since I was put in here because of fake IDs, which have

4   nothing to do with fraud.

5       So -- and now I have no ties to anywhere else in the

6   world.  They are -- the fake passports are not -- they are not

7   copies of real passports.  Those -- those are -- it's my

8   passport with -- so it's an -- it's a paper copy.  It cannot be

9   used to go anywhere in the world.  It's literally a photo --

10  paper copy of my passport.  It doesn't -- you know, you can't

11  use it to -- the only thing you can use it for is to go UPS and

12  prove that you are yourself or that you have authority for

13  certain accounts.  That's the only thing that a photocopy

14  passport is used for.  It's not used for traveling.  I don't

15  have an ID.  I don't have a means of obtaining an ID.

16      And I -- I have -- I have -- you know, sorry.  So

17  I'm -- the only thing I'm trying to do is fight this case.

18  There is no reason for me to flee.  There is no basis for

19  concluding that I propose a flight risk.  I voluntarily turned

20  myself in to the officers, which is -- which is part of the

21  record.  I have family -- my whole family is New York.  They

22  can attest to my phone calls.  Everybody I love in this world

23  is really in New York.  I've never fleed [sic] any court --

24  court.  The one that -- the one -- the one -- the arrest

25  warrant that emanated out of Miami, that only came after I --

```
1    my home was -- well, I was blocked access to my home.

2    Essentially, my home was stolen from me without process, as

3    they know, and a mail -- a mailing order informing me of --

4            MR. MCLAUGHLIN:  Your Honor, I'm going to object to

5    this.  The focus of the hearing is on whether Mr. Mujo is a

6    flight risk or a danger to the community.

7            THE DEFENDANT:  It's also focus of CEM being the

8    lender or not.  CEM --

9            THE COURT:  That's correct, Mr. Muho.  If you will

10   stick --

11           THE DEFENDANT:  I apologize, Your Honor.

12           THE COURT:  -- to the basis of your motion, and I have

13   already heard the proffer and I have heard your response to it.

14           THE DEFENDANT:  Okay.  Thank you, Your Honor.

15           THE COURT:  Is there anything further, sir?

16           THE DEFENDANT:  No, Your Honor.

17   Thank you.

18           THE COURT:  Any response to Mr. Muho's motion?

19           MR. MCLAUGHLIN:  Other than what I have provided by

20   proffer, Your Honor, and my written response in terms of why we

21   believe he's a flight risk and a danger to the community, no.

22           THE DEFENDANT:  Your Honor, if I may add, I never got

23   notice of the arraignment in the Miami case and I filed a

24   motion to dismiss on March 25th, before I was arrested, as soon

25   as I learned about it.  And I also flew in for a hearing which
```

1    turned out it was not scheduled.  I simply did not get notice

2    of the -- of the -- of the hearing.  That's my only reason for

3    not -- and I did show up and I participated.  It's -- it's --

4    it's -- it's frivolous to really claim that I -- that I -- that

5    I -- that I -- I didn't participate.

6           THE COURT:  All right.  Let me address both motions

7    that before the Court.

8           First addressing the Government's motion for pretrial

9    detention based on risk of flight and danger to the community.

10   There is no need to question the witnesses based on the

11   proffer.  While the Court certainly finds that Mr. Muho may

12   present a risk of flight based on a preponderance of the

13   evidence, certainly based on a standard of clear and convincing

14   evidence, the Court does not find that Mr. Muho is a danger to

15   the community.  As such, the Government's request for pretrial

16   detention under 18, United States Code, Section 3142,

17   Subsection E, is denied.

18          With regard to the Defendant's motion to set a

19   reasonable bond, the Court believes that the bond that was

20   previously set by Judge Hunt is, in fact, reasonable and will

21   ensure that Defendant's presence at the time of trial.

22          So the original bond that was set on June 22nd, 2016,

23   that is a $250,000 corporate surety bond, with a Nebbia

24   requirement, will remain.  That will ensure Mr. Muho's

25   attendance at all future proceedings.

```
 1            THE DEFENDANT:  Your Honor --

 2            THE COURT:  As such, the Court has addressed those two

 3   motions, leaving the Court with remaining motions that I would

 4   like to hear.  And as the Court has set this afternoon, I would

 5   like to set for hearing on this Monday, at 9:00 a.m.  What will

 6   be argued at that time will be the Defendant's motion to

 7   dismiss.  And I would request, Mr. McLaughlin, that the

 8   Government, as set forth in Docket Entry 101, expedite a

 9   response in the filing of speedy trial report.

10            The Court will also hear at that time Docket Entry 92,

11   the motion to suppress all evidence -- Docket Entry 90 has

12   already been addressed by the Court, which was the request to

13   proceed pro se -- and Docket Entry 75, the motion for

14   discovery; Docket Entry 71, the motion in limine, thereby

15   addressing all the motions that are properly before the Court.

16            This is scheduled for a calendar call on

17   February 14th.  And consistent with other cases, the Court

18   naturally wants to have all motions addressed before calendar

19   call.  So I will require that any additional motions that have

20   not been filed to be filed by February 7th and the Court then

21   will set that for hearing the following two days, on the 9th or

22   the 10th, depending upon whether the Court can expedite a

23   response and proceed to a ruling on the paper as opposed to an

24   evidentiary hearing.

25            I have addressed all of the issues that are properly
```

1    before the Court, and I will see the parties back before the

2    Court this Monday at 9:00 a.m. to address the additional

3    motions.

4            THE DEFENDANT:  Your Honor, may I ask for a personal

5    surety bond, instead of a corporate surety bond?

6            THE COURT:  That request is denied, Mr. Muho.  I have

7    already ruled.

8            THE DEFENDANT:  Thank you.

9            THE COURT:  And I want it to be clear, sir, that you

10   are subject to the same rules of evidence and the same rules of

11   court procedure.  So ore tenus motions are not permitted.

12   Anything must be in writing.  And as you have advised,

13   Mr. Harris will be the individual that will file those motions

14   at your direction.

15           THE DEFENDANT:  Thank you, Your Honor.

16           MR. HARRIS:  Thank you, Your Honor.

17           THE COURT:  Have a pleasant weekend and I'll see you

18   Monday morning.

19      (Proceedings concluded at 5:25 p.m.)

20

21

22

23

24

25

```
 1    UNITED STATES OF AMERICA        )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                      C E R T I F I C A T E

 5          I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 3rd

 9    day of February, 2017, in the above-mentioned court; and that

10    the foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13    1 - 69.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida this 3rd day of April, 2017.

16

17                        /s/Yvette Hernandez
                          Yvette Hernandez, CSR, RPR, CLR
18                        Certified Shorthand Reporter
                          400 North Miami Avenue, 10-2
19                        Miami, Florida 33128
                          (305) 523-5698
20                        yvette_hernandez@flsd.uscourts.gov

21

22

23

24

25
```