UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   16-20390-CR-BLOOM(s)(s)

UNITED STATES OF AMERICA

vs.

GERTI MUHO,

     Defendant.

_____

## GOVERNMENT PSI OBJECTIONS & SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files the following Sentencing Memorandum and Objections to the Pre-Sentence Investigation Report ("PSI") (DE 301).

For Counts 1-19 and 38-40, Muho's total offense level should be 40, not 38 (PSI ¶ 101). See 18 U.S.C. §§ 1344, 1343, and 1957.   For Counts 1-18, the statutory maximum penalty is 360 months' imprisonment.   See 18 U.S.C. §§ 1344, 1343.   For Count 19, the statutory maximum penalty is 240 months' imprisonment.   See 18 U.S.C. § 1343.   For Counts 38-40, the statutory maximum penalty is 120 months' imprisonment.   See 18 U.S.C. § 1957.   With a category I criminal history, Muho's total advisory guideline range should be 292-360 months' imprisonment (PSI ¶ 140).

For Counts 20-37, Muho's advisory guideline range is 24 months' imprisonment for each count.   See 18 U.S.C. § 1028A.   For Counts 20-37, the Court must also run at least one (1) § 1028A count consecutive to his sentence for Counts 1-19 and 38-40, and may run any of the § 1028A violations consecutively or concurrently with each other (PSI ¶ 140).

Pursuant to the statutory factors set forth in 18 U.S.C. § 3553, this Court should impose the

following sentences: 1) for Counts 1-18, a sentence within the 292-360 month advisory guideline range for each count; 2) for Count 19, a sentence of 240 months' imprisonment; 3) for Counts 38-40, a sentence of 120 months' imprisonment for each count.   Muho's sentences for Counts 1-19 and 38-40 should all run concurrent with each other.   For Counts 20-37, under § 1028A, the Court must impose at least one (1) consecutive 24-month sentence to Muho's total sentence for Counts 1-19 and 38-40.

This Court should impose a total sentence of at least 316 months' imprisonment.

## I.      PROCEDURAL HISTORY

On or about May 16, 2016, Muho was arrested, in the Eastern District of New York ("EDNY"), pursuant to a sealed criminal complaint from the Southern District of Florida ("SDFL") charging violations of 18 U.S.C. §§ 1344, 1343, and 1028A (DE 1, 11).   Thereafter, a federal grand jury sitting in Miami, FL, returned a 36-count Indictment charging Muho with violations of 18 U.S.C. §§ 1344, 1343, and 1028A (DE 7).   The Court initially set trial for September 12, 2016 (DE 31).

Beginning in and around August 2016, and continuing through January 2017, Muho refused representation from three (3) different defense counsel and underwent a court-ordered competency evaluation under 18 U.S.C. § 4241.   Thereafter, the Court allowed Muho, at his own request, to proceed *pro se* (DE 34, 37, 41, 48, 59, 90, 94, 109).   On January 31, 2017, Muho filed a pre-trial motion to suppress evidence obtained from his prior residence located at 1100 Biscayne Blvd, Apt. 5303, Miami, FL, 33132 (hereinafter "Miami Condo") (DE 92, 96).

On February 6, 2017, the Court conducted a hearing as to Muho's suppression motion.   At the hearing, the Government offered evidence and testimony in opposition (DE 96, 116, 226).   In support of his motion, Muho provided sworn, materially false testimony (DE 226).   Thereafter,

the Court denied the motion to suppress (DE 115).

On February 13, 2017, Muho filed a notice of interlocutory appeal regarding an earlier motion for bond (DE 66, 67, 154).    Pursuant to his appeal, the Court granted Muho's motion to stay proceedings pending the outcome of his appeal (DE 155, 156).    On March 9, 2017, a federal grand jury sitting in Miami, FL, returned a 40-count Second Superseding Indictment charging Muho with violations of 18 U.S.C. §§ 1344, 1343, 1028A, and 1957 (DE 170).    On May 16, 2017, the U.S. Court of Appeals for the Eleventh Circuit denied Muho's interlocutory appeal regarding bond (DE 185).

Beginning on June 26, 2017, Muho, with assistance of stand-by counsel, proceeded to trial (DE 247).    At trial, the Government entered approximately 186 different exhibits into evidence, which included, but were not limited to, various search warrant seizures, identification documents, and banking, loan, financial, business, tax, and email records (DE 288-290, 292, 294, 295). Additionally, the Government offered trial testimony from approximately 31 different witnesses, including various real-person and business victims (DE 295).

Muho offered evidence and witness testimony in his own defense (DE 285, 286).    During his defense case, Muho provided three (3) days of sworn, materially false trial testimony.    On July 14, 2017, the jury returned a verdict finding Muho guilty as to all counts (DE 279). Thereafter, Muho elected to be represented by counsel for purposes of sentencing (DE 273, 274). Muho's sentencing is now scheduled for January 18, 2018 (DE 306).

## II.    MUHO's PSI OFFENSE LEVELS & ADJUSTMENTS

For Counts 1-19 and 38-40, Muho's total offense level should be 40, not 38 (PSI ¶ 101). Because Muho was convicted of an offense with a statutory maximum penalty of 20 years or more of imprisonment (DE 170, 279), his starting base offense level is seven (7) (PSI ¶ 93).    See

U.S.S.G. § 2B1.1(a)(1); 18 U.S.C. §§ 1343 and 1344.    Muho's relevant loss amount is more than $3.5 million , but less than $9.5 million.    Thus, his offense level increases to 25 (PSI ¶ 93).    See U.S.S.G. §§ 1B1.3(a)(1)(A)-(B) and 2B1.1(b)(1)(J); see also U.S.S.G. § 2B1.1 cmt. n.3(A)-(E).

Pursuant to the PSI, Muho's base offense level next increases to 33 due to four (4) different applicable two-level adjustments: 1) 10 or more victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A); 2) misrepresentation or other fraudulent action during bankruptcy proceedings under § 2B1.1(b)(9)(B); 3) sophisticated means pursuant to § 2B1.1(b)(10)(C); and 4) deriving more than $1 million in gross receipts from a financial institution under § 2B1.1(b)(16)(A) (PSI ¶ 93). However, as set forth below, Muho's offense level should increase an additional two (2) levels, pursuant to U.S.S.G. § 2B1.1(b)(11)(A)-(B), due to the use of device making equipment and production of counterfeit and/or unauthorized access devices.    Due to his conviction for violating 18 U.S.C. § 1957, Muho's offense level should increase to 36.    See U.S.S.G. § 2S1.1(b)(2)(A) (PSI ¶ 94).

Because Muho abused a position of public/private trust, his offense should increase to 38 (PSI ¶ 96).    Based on his sworn, materially false suppression hearing and trial testimony, including his 2013 misleading interactions with law enforcement regarding his own fraud conduct, Muho obstructed justice, which should result in a total offense level of 40 (PSI ¶¶ 98, 101).    For Counts 1-19 and 38-40, with a category I criminal history, his total advisory guideline range is 292-360 months' imprisonment.

For Counts 20-37, Muho's advisory guideline range is 24 months' imprisonment for each § 1028A violation.    The Court must run at least one (1) § 1028A count consecutive to Muho's sentence for Counts 1-19 and 38-40, and may run any of § 1028A violations consecutively or concurrently with each other (PSI ¶ 140).    The Government's support for the various guideline

enhancements, and pertinent PSI objections, are set forth below.

### A.    Guideline Calculations & Relevant Conduct

"When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing sufficient and reliable evidence to prove the necessary facts by a preponderance of the evidence."   United States v. Washington, 714 F.3d 1358, 1361 (11th Cir. 2013) (internal quotations and citations omitted). The Eleventh Circuit "clearly provides that reliable hearsay can be considered during sentencing." United States v. Zlatogur, 271 F.3d 1025, 1031 (11th Cir. 2001).   Moreover, "[u]ncharged conduct may constitute relevant conduct."   United States v. Valladares, 544 F.3d 1257, 1268 (11th Cir. 2008).

Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . .  that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."   U.S.S.G. § 1B1.3(a)(1).[1] Relevant conduct includes, for counts that require grouping under Section 3D1.2(d), "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."   U.S.S.G. § 1B1.3(a)(2).   It also pertains to "all harm that resulted from the acts and omissions specified in [U.S.S.G. § 1B1.3(a)(1)-(2)], and all harm that was the object of such acts and omissions."   Id. at § 1B1.3(a)(3).

"For two or more offenses to constitute part of a common scheme or plan, they must be

---

[1]   Relevant conduct also involves ". . . all acts and omissions of others that were - (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."   U.S.S.G. § 1B1.3(a)(1)(B).

substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 cmt. n.5(B)(i). Alternatively, offenses are "part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id. at n.5(B)(ii). "Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." Id.

**B.    Loss Amount**

For purposes of Section 2B1.1, a district court "need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." U.S.S.G. § 2B1.1 cmt. n.3(C). Generally, "loss is the greater of actual loss or intended loss." Id. at n.3(A).[2]

Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i).[3] "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money. . . . [and] does not include emotional distress, harm to reputation, or other non-economic harm." Id. at n.3(A)(iii). Intended loss is "the pecuniary harm that the defendant purposely sought to inflict," including the "intended pecuniary harm that would have been impossible or unlikely to occur . . . ." Id. at n.3(A)(ii). "The determination of

---

[2] "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 cmt. n.3(B).

[3] Reasonably foreseeable pecuniary harm is the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(iv).

intended loss under the Sentencing Guidelines therefore focuses on the conduct of the defendant and the objective financial risk to victims caused by that conduct." United States v. Patterson, 595 F.3d 1324, 1327 (11th Cir. 2010) (quoting United States v. Lane, 323 F.3d 568, 590 (7th Cir. 2003)). "[W]hen a sentencing court is determining the proper punishment for a defendant's fraud, the court uses the reasonable mathematical limit of his scheme, rather than his concrete result.  A criminal pays the price for the ambition of his acts, not their thoroughness." Patterson, 595 F.3d at 1327; see also United States v. Falcioni, 45 F.3d 24, 27 (2d Cir. 1995) ("Simply because the government's [or victim's] crime prevention efforts prove successful, however, does not mean that the 'intended loss' is zero").

Muho's total, relevant loss amount should be $8,649,164.88.  The PSI correctly assigns Muho's relevant loss amount as more than $3.5 million, but less than $9.5 million (PSI ¶ 93), which results in a offense level of 25.  See U.S.S.G. § 2B1.1(b)(1)(J).  The Government's specific loss calculations, pertinent PSI objections, are set forth below.

### 1.   *Richcourt-Related Loss*

The PSI correctly assigns a loss amount of $5 million for this conduct (PSI ¶¶ 33-35, 78). As set forth during the Government's case-in-chief, beginning during June 2012, Muho was employed in New York, NY, with the investment firm Fletcher Asset Management ("FAM").  As explained at trial, FAM was founded, owned, and operated by Alphonse "Buddy" Fletcher.  FAM also managed a series of funds called the Richcourt Funds, which were comprised of a series of funds in the British Virgin Islands ("BVI") and Cayman Islands.  Soundview Elite was a Richcourt entity, compromised of various investor funds, based out of the Cayman Islands.[4]

---

[4]   Soundview Elite contained the following real person and corporate investor victims: 1) real person A.W.; 2) Nautical Nominees Limited; 3) real person M.B.; 4) Credit Suisse London Nominees Ltd.; 5) real person R.G. ref. Bank Vontobel AG; and 6) Raiffeisen Switzerland

As explained through the Government's trial testimony and exhibits, during early 2013 Debroah Midanek was hired by Fletcher/FAM to manage the Richcourt Funds.   Midanek was appointed to the relevant Boards of Directors for the Richcourt entities.   Midanek also promptly acted to remove Muho from all relevant Boards of Directors, bank accounts, and positions of authority related to Richcourt and FAM (GTX 2C-1, 2C-4).[5]

In response to Midanek's activities and to initiate his fraud schemes, on or about April 29, 2013, Muho created the sham Delaware company "Leveraged Hawk Inc." (GTX 10B-1). Thereafter, Muho created a false and fictitious litigation and stock sale agreement claiming that he was entitled to approximately $5 million from various Richcourt entities (GX 2C-8).   On or about May 7, 2013, Muho submitted various false and fraudulent wire instructions and directives to Wilmington Trust requesting that it transfer approximately $5 million from various Richcourt accounts to his own Citibank account xxx-5214 (GTX 2C-6).   In and around this time, Muho was summarily terminated by FAM (GTX 2C-1, 2C-4, 2C-5).   The relevant, intended loss for this conduct is $5 million (PSI ¶¶ 33-35).   See U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).[6]

---

Cooperative (GSX 1).

[5]  For purposes of this filing, "GTX" refers to Government Trial Exhibits and "GSX" refers to Government Sentencing Exhibits.   The redacted Government Trial Exhibits have already been filed with the Court (DE 283, 285-86, 288-295).   The Government Sentencing Exhibits will be provided to the Court and defense counsel prior to sentencing and will be redacted and filed after sentencing.

[6]  In response to Muho's conduct, Wilmington Trust froze all of the Richcourt accounts and sought judicial intervention as to who actually controlled the Richcourt entities.   This ultimately lead to civil litigation in Delaware Superior Court-Newcastle case number N13C-06-156 and bankruptcy proceedings in Southern District of New York ("SDNY") bankruptcy case number 13-13098 (GSX 3A-B, 4A).

2.      *Soundview Elite-HSBC-Monaco Loss*

The PSI correctly assigns a loss amount of $2,067,377 million for this conduct (PSI ¶¶ 33-36, 78).   After his firing from FAM, Muho unlawfully obtained and retained, via FAM computer storage and servers, voluminous financial and personal identifying information and data of various victims associated with his former employer, including Soundview Elite (GTX 3-5, 6A-C). When promptly requested by FAM to return this information, Muho refused (GTX 2C-1).   On June 3, 2013, Muho filed a false and fraudulent "Certificate of Merger" with the State of Delaware claiming that various Richcourt entities, including Soundview Elite, had agreed to merge into his sham company Leveraged Hawk (GTX 10B-1, 43).   Purporting to register as an investment advisor, Muho also filed similar false and fraudulent documentation and information with the U.S. Securities and Exchange Commission ("SEC") (GTX 41A-B, 43).

Beginning in June 2013, and continuing through August 2013, Muho materially misrepresented to HSBC-Monaco that he possessed legal authority to execute financial transactions on behalf of Soundview Elite (GTX 2C-7, 9A-H, 43).   On or about August 8, 2013, based on these material misrepresentations, Muho unlawfully obtained approximately $2,067,377.24, via international wire transfer, from Soundview Elite's HSBC-Monaco bank account.   Muho quickly transferred these funds from his Citibank account xxxx-4214 to various other bank accounts for his own use and benefit (GTX 43).   The relevant, intended loss amount for this conduct is $2,067,377 (PSI ¶¶ 35-36).[7]   *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(i).

_____

[7]     This lead to civil litigation in SDNY case number 13-CV-06895.   Based on a federal court order (GTX 10A), the Soundview Elite victims were only able to recoup approximately $576,244.31 of these funds from Muho's bank accounts (GTX 43).   For purposes of Section 2B1.1., the funds recouped by the Soundview Elite victims are not credited against Muho's relevant loss amount because these funds were not returned "by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."   U.S.S.G. § 2B1.1 cmt. n.3(E)(i).

3.      *CEM Loan Loss*

The PSI assigns a loss amount of $463,000 for this transaction (PSI ¶¶ 37-40, 78).    The Government objects.    During September 2013, Muho utilized at least approximately $720,000 of the fraudulently obtained Soundview Elite/HSBC-Monaco funds to purchase the Miami Condo. To disguise his conduct, Muho purchased the property under the name "Blue 5303 Land Trust." During November 2014, Muho, under the guise of in the name of GM Capital and "Gerard Morgan," falsely and fraudulently obtained a loan, in the amount of $453,710, from CEM Investments LLC and Capital Financial.    For purposes of the loan, Muho provided the Miami Condo as collateral (GTX 6B-C, 11A, 12A-B, 13A-1, 14A-E, 15A-C, 16, 17A, 44).

Contrary to his loan agreements, Muho utilized these proceeds for his own personal use and benefit (GTX 44).    As litigated during Muho's suppression hearing, on May 28, 2015, CEM initiated a foreclosure action in Miami-Dade County case number 15-11944-CA-30.    On September 1, 2015, a final foreclosure judgement was entered in CEM's favor.    On October 21, 2015, CEM conducted a foreclosure sale and a certificate of title was issued to the new owners. On February 2, 2016, the new owners obtained a writ of possession to remove all persons and allow the new owners to take possession (DE 116).

For purposes of Section 2B1.1, actual loss amounts must be reduced by, "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n.3(E)(ii).    As set forth at trial, the October 2015 foreclosure sale allowed CEM to recoup its loan investment and be made whole (PSI ¶¶ 37-40).

However, "loss is the greater of actual loss or intended loss."    U.S.S.G. § 2B1.1 cmt.

n.3(A).   Moreover, "[i]n the fraudulent loan application context, we have recognized that sentencing based on intended loss is appropriate even where no actual loss occurred."   United States v. Greene, 279 Fed. Appx. 902, 908 (11th Cir. 2008) (unpub. op.) (citing United States v. Menichino, 989 F.2d 438, 442 (11th Cir. 1993) (per curiam)).   In Greene, the Eleventh Circuit noted that, although, "the property sold at foreclosure for a price higher than the mortgage amount less than two years later, such that the lender did not suffer an actual loss, the district court did not clearly err by using the intended loss."   Greene, 279 Fed. Appx. at 909.   Similar to Greene, the relevant, intended loss for this transaction should be $453,710 – the amount CEM financed for Muho's loan (PSI ¶ 78; GX 44).

4.   *Space Coast Loan Loss*

The PSI assigns a loss amount of $38,544.14 for this transaction (PSI ¶¶ 41-42, 78).   The Government objects.   During August 2013, Muho utilized at least approximately $115,500 of the Soundview Elite/HSBC-Monaco funds to purchase a 2013 Maserti GT vehicle in New York, NY. To disguise his conduct, Muho purchased the vehicle under the name "Leveraged Hawk" (GTX 2C-10, 11A, 18A, 45).

On February 14, 2015, Muho purchased a 2015 Jaguar F-Type GT vehicle, for approximately $108,000, in Coral Gables, FL.   To complete the transaction, Muho: 1) traded in the 2013 Maserti for approximately $63,000; 2) wired $15,000 from his JPMC account xxxx-7522, and 3) fraudulently obtained a $30,407 loan from Space Coast Credit Union (GTX 17A, 18B, 19A, 20).   In his fraudulent loan application with Space Coast, Muho utilized the alias "Gerard Morgan," falsified his social security number, and materially misrepresented his employment and income, and also submitted fictitious IRS W-2 and 1099 records (id.).

As set forth at trial, Muho never made any payments and defaulted on the loan.   Space

Coast was ultimately able to take possession of the vehicle in New York during 2016, prior to Muho's arrest.   The relevant, intended loss for this transaction should be $30,407 – the amount Space Coast financed for Muho's loan (PSI ¶ 78; GX 45).

         *5.*    <u>*Wells Fargo Loss*</u>

The PSI assigns a loss amount of $31,314.07 for Muho's Wells Fargo-related conduct (PSI ¶¶ 43-46, 78).   The Government objects.

Where the Government's evidence indicates that a defendant intended to utilize the full face value of stolen, counterfeit, or fraudulent checks, which the defendant fails to refute at sentencing, "a district court is especially justified in including the checks' full face value in its intended loss calculation." <u>United States v. Grant</u>, 431 F.3d 760, 765 (11th Cir. 2005); <u>see also United States v. Chukwura</u>, 5 F.3d 1420, 1425 (11th Cir. 1993) (because defendant "represented the checks as genuine, the sentencing court calculated the total loss as the aggregate amount of the fraudulent checks").   Other circuits have also held that "it is not an error of law for a court to draw inferences from the face value of the checks in arriving at the factual conclusion that the defendant intended to let all the horses out if possible."   <u>United States v. Geevers</u>, 226 F.3d 186, 193 (3d Cir. 2000).

During September 2012, while still working at FAM, Muho opened Wells Fargo account xxxx-2153 in the name of "Richcourt USA" (GSX 5 at 26).   On December 18, 2013, Muho fraudulently deposited Charles Schwab check #20098, in the amount of $10,995, into Wells Fargo xxxx-2153 (GSX 5 at 29; GTX 13A-1).   The next day, Muho deposited Charles Schwab check #20100, in the amount of $14,500, into Wells Fargo xxxx-2153 (GSX 5 at 29; GTX 13A-1).   Both checks emanated from the same Charles Schwab account that Muho utilized to deposit approximately $725,000 in HSBC-Monaco fraud proceeds (GTX 13A-1).   At the time Muho

issued both checks, the actual Charles Schwab account balance was $3.81 (id.).   Muho was captured on Wells Fargo video withdrawing a significant portion of the proceeds before both checks bounced (GSX 5 at 31-39).

During October 2013, Muho opened Wells Fargo account xxx-4794 in the name of "GM Capital" (GTX 42C).   On November 20, 2013, Muho deposited Citibank check #10522, in the amount of $5,500, into Wells Fargo xxx-4794   (GTX 42C).   This check was written from Muho's Citibank account xxx-4895, which had been frozen because he deposited approximately $100,000 in HSBC-Monaco fraud proceeds into the account (GTX 11C, 43).   Nonetheless, Muho was able to withdraw a significant portion of the proceeds from Wells Fargo before the check bounced (GTX 11C).

During September 2015, Muho, utilizing the personal identifying information of victim T.D.V., fraudulently opened Wells Fargo accounts xxx-8899 and xxx-7601 (GTX 21A-C, 46). Thereafter, Muho made approximately $420 worth of deposits into the accounts, including fraudulent a BoA check for $300 (id.).   Muho was also able to withdraw and/or utilize some of these check proceeds (GTX 21A).   The total intended loss for Muho's Wells Fargo conduct should be $31,295.

6.   *PNC Loss*

The PSI assigns a loss amount of $83,100.75 for this conduct (PSI ¶¶ 47-50, 78).   The Government objects.

On October 16, 2013, Muho opened PNC account xxx-7602 in his own name (GSX 6 at 10).   On November 19, 2013, Muho deposited Citibank check #2006, in the amount of $32,400.75, into PNC xxx-7602 (id. at 12-14).   This check was written from Muho's Citibank account xxx-1297, which had been frozen because he deposited approximately $556,988.40 in

HSBC-Monaco fraud proceeds into the account (GTX 11B, 43).    Nonetheless, Muho was able to

withdraw a significant portion of the proceeds from PNC before the check bounced (GSX 6 at 14).

During October 2015, Muho, utilizing the personal identifying information of victim

T.D.V., fraudulently opened PNC account xxx-7156 (GTX 23A-C, 46).    Thereafter, Muho made

approximately $52,716.99 worth of deposits into the account, including fraudulent BoA, UMB,

AMEX, and SVB checks totaling $52,450 (id.).    Muho was also able to withdraw and/or utilize

some of these check proceeds (GTX 23A).    The total intended loss for Muho's PNC conduct

should be $84,850.75.

### 7.    *BoA Loss*

The PSI assigns a loss amount of $14,134.40 for this conduct (PSI ¶¶ 51-59, 78).    The

Government objects.

During October 2015, Muho, utilizing the personal identifying information of victim

T.D.V., fraudulently opened BoA accounts xxx-4471, xxx-4784, xxx-2760, xxx-8119, and xxx-

2810 (GTX 25B-C, 25E-F, 27A-C, 46).    Thereafter, Muho made various deposits into these BoA

accounts, including fraudulent BoA, SVB, AMEX, PNC, and checks totaling $11,900 (id.).

Muho was also able to withdraw and/or utilize some of these check proceeds (GTX 25C).    The

total intended loss for Muho's BoA conduct should be $11,900.

### 8.    *TD Bank Loss*

The PSI assigns a loss amount of $13,750 for this conduct (PSI ¶¶ 60-62, 78).    The

Government objects.

During late October 2015, Muho, utilizing the personal identifying information of victim

T.D.V., fraudulently opened TD Bank accounts xxx-8119 and xxx-2810 (GTX 27A-C, 46).

Thereafter, Muho made a series of deposits into the accounts utilizing fictitious and fraudulent

HSBC and SVB checks totaling $13,790 (id.).    Muho was unable to withdraw and/or utilize the

fraudulent check proceeds (GTX 23A).   The total intended loss for Muho's TD Bank conduct should be $13,790.

        *9.*     *Sallie Mae Loss*

The PSI assigns a loss amount of $100,000 for this conduct (PSI ¶¶ 63-65, 78).   The Government objects.

During November 2015 and December 2015, Muho, utilizing the personal identifying information of victim MH.G. and others, submitted false and fraudulent loan applicants to Sallie Mae in order to obtain various student loans.   As set forth at trial, on November 24, 2015, Muho submitted fraudulent Sallie Mae loan application xxx-02-01, for $30,000, in the names of "Jessica Rose" and M.H.G. (GTX 37A).   On December 15, 2015, Muho submitted fraudulent Sallie Mae loan application xxx-49-01, for $15,000, in the names of "Kris Blair" and M.H.G., which Sallie Mae funded (GTX 37B).

Muho also submitted various other fraudulent Sallie Mae loan applications.   Clearly relevant conduct, Muho submitted at least four (4) additional fraudulent loan applications, totaling $75,000, to Sallie Mae (GSX 7A-D).   On November 8, 2015, Muho, utilizing the alias "Kris Blair" and M.H.G.'s personal identifying information, submitted Sallie Mae bar study loan application xxx-15-01, for $15,000 (GSX 7A).   On November 12, 2015, Muho, utilizing the alias "Marcus Cimino" and M.H.G.'s personal identifying information, submitted Sallie Mae medical residency and relocation loan application xxx-82-01, for $20,000 (GSX 7B).   On November 17, 2015, Muho, utilizing the alias "Kristin Firth" and M.H.G.'s personal identifying information, submitted Sallie Mae student loan application xxx-74-01, for $25,000 (GSX 7C).   On December 15, 2015, Muho, utilizing the alias "Kris Blair" and M.H.G.'s personal identifying information, submitted Sallie Mae student loan application xxx-97-01, for $15,000 (GSX 7D).   The total

intended loss for Muho's Sallie Mae conduct should be $120,000.

10.   *Pen Fed Loss*

The PSI correctly assigns a loss amount of $235,000 for this conduct (PSI ¶¶ 66-67, 78). As set forth at trial, Muho, utilizing the personal identifying information of victim C.F., opened a Pen Fed account (GTX 39A-C, 49).   On December 14, 2015, Muho, utilizing the personal identifying information of victims C.F. and M.H.G., submitted a fraudulent car loan application for $100,000 (GTX 39B).   That same day, Muho also submitted a fraudulent $50,000 credit application (GTX 39C).[8]   PenFed denied both applications.

Clearly relevant conduct, Muho also submitted various other PenFed loan applications totaling $85,000 (GSX 8).   On November 24, 2015, Muho, utilizing the alias "Kris Blair," opened a PenFed account (id. at 2-4).   That same day, also utilizing M.H.G.'s personal identifying information, Muho submitted fraudulent car loan application xxx-4195 for $60,000, which was denied (GTX 2C-11; GSX 8 at 10-14).   On March 11, 2016, Muho, utilizing M.H.G.'s personal identifying information, opened a PenFed account and submitted fraudulent personal loan application xxx-9806 for $25,000, which Pen Fed denied (id. 16-18).   The total intended loss for Muho's PenFed conduct should be $235,000.

11.   *Upstart Loss*

The PSI correctly assigns an intended loss amount of $35,000 for this conduct (PSI ¶¶ 68, 78).   Muho, utilizing the personal identifying information of victim T.D.V, submitted a fraudulent loan application to Upstart and Cross River Bank for $35,000 (GTX 22, 29-30, 47).

---

[8]   "[O]nce a defendant has gained access to a certain credit line by fraudulently applying for credit cards, a district court does not err in determining the amount of the intended loss as the total line of credit to which Defendant could have access, especially when Defendant presents no evidence that he did not intend to utilize all of the credit available on the cards."   United States v. Nosrati-Shamloo, 255 F.3d 1290, 1291 (11th Cir. 2001).

Upstart denied the application.

12.    _Mayors Jewelers/Comenity Bank Loss_

The PSI correctly assigns an intended loss amount of $7,700 for this conduct (PSI ¶¶ 69-70, 78).   Muho, utilizing the personal identifying information of victim T.D.V, submitted a fraudulent loan application to Mayor's Jeweler's and Alliance Credit/Comenity Bank for $7,700 (GTX 23A, 31-33, 48).   Both lenders denied the application.

13.    _AMEX Loss_

The PSI correctly assigns an actual loss amount of $2,667.47 for this conduct (PSI ¶ 78). During August 2014, Muho, utilizing the alias "Enton Pinguli," fraudulently opened an American Express ("AMEX") account (GSX 9).   On the AMEX credit application, Muho utilized a fictitious date-of-birth and social security number and fraudulently claimed to work at GM Capital, earning approximately $100,000 per year.    He also listed the email address: "morgang@gmcapital.net."    Thereafter, Muho fraudulently added "Gerard Morgan" to the account, utilizing a fictitious social security number and the email address: "pm@lhifunds.com" (id.)

Muho utilized the AMEX account to incur approximately $2,667.47 in fraudulent charges, resulting in a loss to AMEX (GSX 9 at 17).   On November 18, 2014, AMEX closed the account. The total intended and actual loss for Muho's AMEX conduct is $2,667.47.

14.    _Capital One Loss_

The PSI correctly assigns an intended loss amount of $126,500 for this conduct (PSI ¶ 78). From August 2014, through May 2016, Muho utilized aliases and the personal identifying information various real person victims, including C.S., M.H.G., G.J.L. and others, to submit

multiple fraudulent credit applications with Capital One Bank[9] (GSX 10 at 2).   On August 20, 2014, Muho, utilizing the alias "Enton Pinguli" fraudulently obtained a credit card, via Capital One account xxx-7062, with a $5,000 credit limit (id.).   Muho utilized a fictitious date-of-birth and social security number and listed his address as 6031 Grove St, Ridgewood, NY, and email address as: "morgang@gmcapital.net."   Muho fraudulently incurred various charges, which caused Capital One to suffer an actual loss of $4,950, and an intended loss of $5,000. (id. at 3-4).

On August 20, 2014, Muho, utilizing personal identifying information of C.S., fraudulently obtained a credit card, via Capital One account xxx-2478, with a $2,000 credit limit (GSX 10 at 2).   C.S. was a former FAM associate and his personal identifying information was located on Muho's seized computers (GTX 6B-C).   The IP address on the application traced back to the Miami Condo (GSX 10 at 2).   Muho was unable to utilize this account; however, the relevant intended loss is $2,000.

On June 12, 2015, Muho, utilizing personal identifying information of B.T., fraudulently obtained two (2) different credit cards, via Capital One accounts xxx-6190 and xxx-8003, with the following credit limits: $7,500 for account xxx-6190 and $2,000 for account xxx-8003 (GSX 10 at 2).   B.T.'s personal identifying information was located on Muho's seized computers (GTX 6B-C).   Muho also listed his address as the Miami Condo (GSX 10 at 2).   Muho was unable to utilize these accounts; however, the relevant intended loss is $9,500.

On October 28, 2015, Muho, utilizing personal identifying information of M.H.G., fraudulently obtained two (2) different credit cards, via Capital One accounts xxx-4406 and xxx-

---

[9]   During this time period, Muho submitted numerous other fraudulent Capital One credit applications, utilizing the aliases "Gerard Morgan" and "Kitt Webb" and the personal identifying information of victims P.S., E.H., F.S., J.T.M., and M.H.G., that were summarily denied.

4474, with the following credit limits: $30,000 for account xxx-4406 and $30,000 for account xxx-4474 (GSX 10 at 2).   Muho listed his email address as: "mg@krisblair.net" (id.).   Muho was unable to utilize these accounts; however, the relevant intended loss is $60,000.

On March 17, 2016, Muho, utilizing the alias "Roy Welland," fraudulently obtained a credit card, via Capital One account xxx-2648, with a $20,000 credit limit (GSX 10 at 2).   Muho utilized a fictitious date-of-birth and social security number and listed his email address as: "jtm@gkmg.net."   The IP address on the application traced back to Muho's Ridgewood, NY, residence (id.).   Muho was unable to utilize this account; however, the relevant intended loss is $20,000.

On May 3, 2016, Muho, utilizing personal identifying information of G.J.L., fraudulently obtained a credit card, via Capital One account xxx-0230, with a $30,000 credit limit (GSX 10 at 2).   G.J.L. was a former FAM associate and his personal identifying information was located on Muho's seized computers (GTX 6B-C).   Muho listed his email address as: "gl@gpmcapital.com" (GSX 10 at 2).   Muho was unable to utilize this account; however, the relevant intended loss is $30,000.

15.   *Campus Door Loss*

The PSI correctly assigns an intended loss amount of $30,000 for this conduct (PSI ¶ 78). During May 2016, Muho, utilizing the alias "Kitt Webb," submitted two (2) fraudulent bar study loan applications xxx-41-01 and 00-01 to Campus Door totaling $30,000 (GSX 11).   Among other material misrepresentations, Muho utilized the personal identifying information of victim M.H.G., as a co-signer, provided a fictitious date-of-birth and social security number, and listed his address as 6031 Grove St, Ridgewood, NY (id.).   Campus Door ultimately denied the applications (GSX 11).

16.    *Barclays Loss*

The PSI assigns a loss amount of $23,000 for this conduct (PSI ¶ 78).   The Government

objects.

Beginning in August 2014, and continuing through October 2014, Muho, posing as "Gerard

Morgan," submitted multiple fraudulent credit card applications to Barclays Bank (GSX 12).   For

Barclays applications xxx-6290, xxx-4776, xxx-3422, xxx-9238, xxx-5090, xxx-3950, xxx-3980,

Muho provided fictitious social security numbers and materially false information regarding his

address and income.   The credit limits for the applications totaled $11,500 and were as follows:

$600 for xxx-6290; $2,000 for xxx-4776; $3,000 for xxx-3422; $900 for xxx-9238; $0 for xxx-

5090, $0 for xxx-3950; and $5,000 for xxx-3980 (id. at 4-10).   Based on Muho's material

misrepresentations, Barclays approved his application for xxx-4776 (id. at 5).   Muho ultimately

stopped making payments, which resulted in an actual loss of $1,352.86 (id. at 15).

During October 2015, Muho, utilizing the personal identifying information of victim

T.D.V., again submitted multiple fraudulent credit card applications to Barclays Bank.   For

Barclays applications xxx-6903 and xxx-4820, Muho provided T.D.V.'s social security number

and materially false information regarding address and income.   The credit limits for the

applications totaled $23,000.   Muho's total intended loss for his Barclays conduct is $34,500.

17.    *T.D.V. Loss*

The PSI assigns a loss amount of $176,474.89 for victim T.D.V.'s losses (PSI ¶ 78).   The

Government objects.   T.D.V.'s losses solely relate to restitution pursuant to 18 U.S.C. §

3663A(b)(4) and should not be included under U.S.S.G. § 2B1.1.

18.    *Amscot Financial Loss*

The PSI assigns a loss amount of $2,600 for this conduct (PSI ¶ 78).   The Government

objects.

As set forth at trial, Muho, utilizing his own name, aliases, and the personal identifying information of victims T.D.V., M.H.G., and J.T.M., cashed fraudulent checks and attempted to obtained cash advances at Amscot Financial (GTX 7B-1-5).    On November 3, 2014, Muho utilized the alias "Gerard Morgan" and cashed a fraudulent $551 check, resulting in a loss to Amscot (GTX 7B-4).    On May 19, 2015, Muho utilized his own name and cashed another fraudulent $551 check, resulting in a loss to Amscot (GTX 7B-5).    On September 7, 2015, Muho also attempt to cash a fraudulent $1,100 check, which was denied (id.)

On September 30, 2015, Muho utilized T.D.V.'s personal identifying information and cashed a fraudulent $450 check, resulting in a loss to Amscot (GTX 7B-1).    On January 11, 2016, Muho utilized J.T.M.'s personal identifying information and attempted to cash a fraudulent $1,650 check, which was denied (GTX 7B-3).    On January 25, 2016, Muho utilized M.H.G.'s personal identifying information and attempted to conduct a deferred presentment transaction, which was denied (GTX 7B-2).    Muho's total intended loss for his Amscot conduct is $3,202.

19.    *Federal Tax Refund Fraud*

As set forth at trial, Muho filed false and fraudulent U.S. tax returns, for himself, for the tax years 2014 and 2015 (GTX 40A).    To the extent that the PSI fails to include this relevant conduct, the Government objects.    For his 2014 return, Muho falsely and fraudulently claimed approximately $1.3 million in income and sought a $171,602 federal tax refund (id.).    For the 2015 return, Muho falsely and fraudulently claimed approximately $1.3 million in income, included fictitious W-2 statements from various Richcourt entities, and sought a $170,169 federal tax refund.    Muho's 2014 and 2015 tax returns were not accepted or paid.    Muho's total intended loss for this conduct is $341,771.

20.    *SunTrust Loss*

To the extent that the PSI fails to include Muho's relevant conduct as to SunTrust Bank

(GSX 13), the Government objects.   During September 2015, Muho, utilizing the personal identifying information of real person victim E.H., opened SunTrust account xxx-7617 in the name of sham company "RG International Dev. LLC" (GSX 13 at 8).   E.H. was a former FAM associate/employee.[10]   Muho made various deposits into the Sun Trust account, including fictitious and fraudulent BoA and Citibank checks totaling $19,494.66 (GSX 13 at 9-14).

Pursuant to a review of Muho's seized computer and other items (GTX 6B-C), Muho's possessed and utilized, without lawful authority, the personal and financial identifying information of E.H. and G.L. to create the counterfeit BoA checks utilizing G.L.'s BoA account xxxx-5505 (GSX 13).   Muho was also able to withdraw and/or utilize some of these fraudulent check proceeds from SunTrust (id. at 9-14).   The total intended loss for Muho's SunTrust conduct should be $19,494.66.

### C.   10 or More Victims

Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), the PSI correctly assigns Muho a two-level adjustment because there were 10 or more victims (PSI ¶ 93).   Under Section 2B1.1, the term "victim" includes "any person who sustained any part of the *actual loss* determined under subsection (b)(1) . . . ."   U.S.S.G. § 2B1.1 cmt. n.1 (*emphasis added*).   The term "person" pertains to "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies."   Id.   Additionally, "[f]or purposes of subsection (b)(2), in a case involving means of identification 'victim' means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority."   U.S.S.G. § 2B1.1 cmt. n.4(E).

---

[10]   Pursuant to searches of his seized computers, Muho also utilized E.H.;s personal identifying to information to produce a variety of fraudulent identifications and driver's licenses (GTX 6B-C).

As set forth above, there were ten (10) or more victims due to Muho's fraud schemes. These victims suffered actual losses or had their means identification used unlawfully or without lawful authority.   They include, but are limited to, the following: 1) real person A.W. (Soundview Elite investor); 2) Nautical Nominees Limited (Soundview Elite investor); 3) real person M.B. (Soundview Elite investor); 4) Credit Suisse London Nominees Ltd. (Soundview Elite investor); 5) real person R.G. ref. Bank Vontobel AG (Soundview Elite investor); 6) Raiffeisen Switzerland Cooperative (Soundview Elite investor); 7) Wells Fargo Bank, 8) PNC Bank; 9) Bank of America; 10) Sallie Mae Bank; 11) Amscot Financial; 12) American Express; 13) SunTrust Bank; 14) Capital One Bank; 15) Barclays Bank; 16) real person T.D.V.; 17) real person M.H.G.; 18) real person C.F.; 19) real person J.P.; 20) real person M.M.; 21) real person E.H.; 22) real person G.L.; 23) real person C.S., and 24) real person G.J.L, among others.

The two-level adjustment under § 2B1.1(b)(2)(A) applies.   Muho's offense level should increase to 27.

### D.   Misrepresentation & Other Fraud During Bankruptcy

The PSI correctly assigns Muho a two-level adjustment for misrepresentation and fraud during bankruptcy proceedings under § 2B1.1(b)(9)(B) (PSI ¶ 93). "The plain language of § [2B1.1(b)(9)(B)] states the enhancement applies to any misrepresentation or other fraudulent action during the course of a bankruptcy proceeding."   United States v. Coyle, 154 Fed. Appx. 173, 175-76 (11th Cir. 2005) (unpub. op.) (internal quotations omitted).   "[T]here is no indication, either in the language of the guideline or its commentary, that the fraudulent conduct or misrepresentation must occur in the defendant's own bankruptcy proceeding."   United States v. Wooten, 270 Fed. Appx. 759, 761 (11th Cir. 2008) (unpub. op.).   Additionally, it is not required that a defendant's fraudulent action or misrepresentation during bankruptcy proceedings occur

during, or in preparation for, the charged scheme.   Fraud and misrepresentation that occurs "in

the course of attempting to avoid detection or responsibility for that offense" qualifies under §

2B1.1(b)(9)(B).   See United States v. Tanke, 743 F.3d 1296, 1307 (9th Cir. 2014) (quoting

U.S.S.G. § 1B1.3(a)(1) and citing defendant's false testimony during bankruptcy proceedings).

Muho engaged in misrepresentation and other fraudulent action during two (2) separate

bankruptcy proceedings in two (2) different federal jurisdictions: SDNY and SDFL.   During

these proceedings, Muho's conduct and statements mirror his sworn, materially false trial

testimony and were clearly designed to cloak his criminal conduct in the veneer of legitimacy and

avoid detection and responsibility for his offenses.

> 1.   *SDNY Bankruptcy Proceedings*

During September 2013, in SDNY bankruptcy case number 13-13098, the Richcourt

entities, including Soundview Elite, and other FAM assets and liabilities were placed in bankruptcy

proceedings (GSX 4A). [11]   During July 2014, Muho filed a *pro se* motion to remove the

bankruptcy trustee, dismiss the bankruptcy action, and obtain other relief (GSX 4B).   Muho

falsely and fraudulently claimed that "since April 29, 2013, [I have] been the sole party in control

of the [Richcourt] Entities and the Entities themselves had merged into Leveraged Hawk, Inc.

("Leveraged") on that same date" (id. at 1).   Among other materially false allegations and

assertions, Muho accused the bankruptcy trustee, Midanek, Fletcher, and others of fraud and

falsely claimed that he conducted a lawful "hostile takeover" and "merger" of the Richcourt

entities (id. at 3).

---

[11]   During September 2015, the bankruptcy trustee also filed an adversary case against
Muho and his sham company GM Capital in SDNY case number 15-01332 (GSX 4F).   Muho
never responded to the allegations or appeared for any hearings.   On October 17, 2016, the
SDNY bankruptcy court entered a default judgement (id.).

In another SDNY *pro se* bankruptcy filing (GSX 4C), Muho claimed that he owed Richcourt investors "over a hundred million dollars; personally, as their sole SEC registered investment advisor, and as their sole legal representative" (id. at 2).   Muho also claimed that "crooks that lied to this court were trying to get me arrested in New York on false charges" and that "fraudulent parties before the court tried to harm me, threatened to kill me, and tried to arrest me" (id. at 3).   Muho denied fraudulently obtaining approximately $2 million from Soundview Elite's account with HSBC-Monaco and declared that he did not have to adhere to the civil judgement and court orders in SDNY case number 13-CV-06895 because they were "void ab initio" (id. at 4).

On August 7, 2014, SDNY U.S. Bankruptcy Judge Robert E. Gerber held a hearing on Muho's motion (GSX 4D).   During the hearing, Muho claimed: "Citco Group Ltd., failing to disclose that itself, defrauded this Court - defrauded this Court which is unfortunate but it is also significant . . . ." (id. at 6).   Muho falsely and fraudulently claimed that he was solely authorized to make decisions for Soundview Elite and other Richcourt entities, but that he also "would have significant claims against the estate" (id. at 7-8).   Muho declared that the SDNY bankruptcy proceedings were illegal and fraudulent (id.).   Muho falsely and fraudulently told Judge Gerber that the $2 million transfer from Soundview Elite's HSBC-Monaco account to his own accounts(s) was entirely lawful (id. at 15).   Muho concluded by arguing that "the Leveraged Hawk merger means that there are no debtors and bankruptcy cannot create a debtor - cannot create a person. . . .   There are no persons since Leveraged Hawk merger completely eviscerated the debtors.   So whoever filed - whatever - whatever alien sort of formed, filed for bankruptcy needs to be eviscerated" (id. at 16).

On August 7, 2014, Judge Gerber denied Muho's motion (GSX 4D, 4G).   On June 3,

2015, Judge Gerber held Muho in contempt of court for violating an automatic stay and filing a

civil suit in SDFL case number 15-21396-CV-WILLIAMS[12] (GSX 4E).   Muho's appeal to the

U.S. Court of Appeals for the Second Circuit was also dismissed (GSX 1K, 4G).

### 2.   *SDFL Bankruptcy Proceedings*

On October 16, 2015, Muho falsely and fraudulently filed for Chapter 11 bankruptcy in

SDFL bankruptcy case number 15-28414-RAM (GSX 14A, 14F).   Muho falsely and fraudulently

claimed approximately $100-$500 million in estimated assets and approximately $100-$500

million in estimated liabilities (GSX 14A at 1).   Muho also falsely and fraudulently claimed

approximately $52,772,741 in specified assets and $27,962,929 in specified liabilities, and

materially omitted Soundview Elite as a creditor (id. at 16-17).

In a filed summary of schedules, Muho fraudulently claimed approximately $316,335,955

in assets, and only $500,000 in liabilities (GSX 14B).   In his case management case summary,

Muho conceded that his SDFL bankruptcy filing was meant, in part, to interfere and disrupt the

SDNY bankruptcy and that he "needed to protect the stakeholders of the Debtor's estates from

being unfairly burdened by the proceedings occurring without their or the Debtor's participation

in the proceedings in New York [that] Debtor was never made a part of" (GSX 14C).   Muho

continued to falsely and fraudulently represent that he was "an asset manager to a number of

investment vehicles set up to make highly leveraged investments in private assets" (id. at 1).

Muho also falsely claimed that he filed Chapter 11 bankruptcy "in order for the Debtor to be able

to able to realize the value of the assets in Debtor's legal and actual possession, which the Debtor

---

[12]   Starting in 2013, Muho began filing a series of *pro se* civil pleadings in various state
and federal courts, involving certain subject matter that, in part, related to his charged conduct
and clearly designed to harass others and avoid detection or responsibility for his crimes (GSX
1A-U).   In 15-21396-CV-WILLIAMS, Judge Williams's dismissal order also noted Muho's
"vexatious and harassing history of re-litigating the same issue . . . ." (GSX 1N).

believes he may not be able to do so without protection of this Court" (id. at 2).

On November 16, 2015, SDFL U.S. Bankruptcy Judge Robert A. Mark held a hearing (GSX 14D).   At the hearing, Muho falsely and fraudulently denied that CEM was a creditor as to the Miami Condo: "they are not a creditor of mine" and "I don't owe them" (id. at 21).   Muho falsely and fraudulently represented that he personally, not his sham company GM Capital, began ownership of the Miami Condo during June 2014 (id. at 22).   Muho also claimed that he failed to purportedly update this information with Miami-Dade County records, prior to CEM foreclosing on the property, because "I just didn't have time, or I didn't know how to do it, or a million things" (id. at 23).

At the hearing, Muho again fraudulently misrepresented that he was entitled to payment from the Richcourt entities (GSX 14D at 26).   Muho falsely accused CEM of threatening his life and breaking into the Miami Condo: "you have those two break ins, and you have essentially a death threat" (id. at 29-30).   Muho falsely claimed that he purchased the Miami Condo under the name "Blue 5303 Land Trust" and appointed GM Capital to manage the trust because: "I was afraid at that time - at the time, for my safety . . . ." (id. at 43).   When questioned as to whether he signed the mortgage and loan documents on the Miami Condo, Muho falsely claimed: "I was unaware at that time. . . . I had no idea what - I had not read anything. . . . I didn't know GM Capital Management was the trustee or had a right to get the mortgage at the time, you know, no" (id. at 43).   On November 24, 2015, Judge Mark dismissed the SDFL bankruptcy petition because Muho failed to attend a scheduled creditors meeting (GSX 14E).

The two-level adjustment under § 2B1.1(b)(9)(B) applies to Muho's SDNY and SDFL bankruptcy conduct.   His offense level should increase to 29.

E.    **Sophisticated Means**

Pursuant to § 2B1.1(b)(10)(C), the PSI correctly assigns Muho a two-level adjustment for sophisticated means (PSI ¶ 93).   "Sophisticated means" pertains to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 cmt. n.9(b).

"There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement.   Rather, it is sufficient if the totality of the scheme was sophisticated."   United States v. Ghertler, 605 F.3d 1256, 1267 (11th Cir. 2010); see also United States v. Horob, 735 F.3d 866, 872 (9th Cir. 2013) (noting that defendant "manipulated several people to lie for him, used several different bank accounts (including accounts of other people) to move funds around, and fabricated numerous documents"); United States v. Arojojoye, 753 F.3d 729, 740 (7th Cir. 2014) (noting defendant's scheme involved "creation of fictitious businesses and acquisition of merchant accounts for the sole purpose of defrauding credit card companies" and "creation of dozens of false documents and accounts, as well as numerous false business entities, and continued for over three years").

The sophisticated means enhancement under § 2B1.1(b)(10)(C) applies to Muho's criminal activities.   Muho's fraud conduct continued for a three-year period.   In order to execute and disguise his schemes, Muho created and utilized numerous shell companies: Leveraged Hawk; GM Capital; Blue Land Trust 5303; Acacius S LLC; and Sera Group LLC, among others (GTX 9A-H, 10B-1-3, 15A-4, 43, 44).   To create an impression of legitimacy, Muho also submitted materially false information to the SEC and purported to register as an SEC investment advisor

(GTX 41A-B).

Muho created and utilized various aliases, including "Gerard Morgan" and "Kris Blair," and fraudulently used and obtained licenses and identification cards from various state agencies (GTX 15C, 20).   He impersonated other, real-person victims.   Muho also fraudulently created, obtained, and utilized various social security cards, credit cards, debit cards, bank accounts, checks, driver's licenses, and other identification documents (GTX 2B1-1-7, 2C-11, 3, 4, 6B, 6C, 8A1-2, 8B-L, 8M-1-12, 22).

In various jurisdictions, Muho opened and utilized numerous bank accounts, including through the use of aliases and sham companies (GTX 11A-E, 13A-1-3, 13B-1-2, 17A-I, 21A-B, 23A-B, 25A-E, 27A-B, 39A, 42A-I).   Muho altered business and bank records and created countless fictitious checks and tax records (GTX 2C-12, 3, 4, 6B, 6C, 8A1-2, 8M-2-12, 15A-6, 18B, 22, 17A-I, 21A-B, 23A-B, 24A-B, 25A-E, 26A-B, 27A-B, 28A-B, 29, 37A-B, 39A-D, 42A-I, 43-50).   Muho filed false tax returns and sought refunds for fraud activities (GTX 40A-G). Muho also created credit monitoring account for one (1) of his fraud victims (GX 35).

Pursuant to § 2B1.1(b)(9)(B), the two-level adjustment for sophisticated means applies to the totality of Muho's conduct.   His offense level should increase to 31.

### F.   Device Making Equipment/Unauthorized and Counterfeit Access Devices

The PSI fails to award Muho a two-level adjustment under U.S.S.G. § 2B1.1(b)(11).   The Government objects.   Under U.S.S.G. § 2B1.1(b)(11), a two-level increase is warranted when a defendant's offenses "involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; [or] (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature . . . ."   U.S.S.G. § 2B1.1(b)(11)(A)-(B).

As directed by § 2B1.1 cmt. n.10, "device-making equipment" involves "any equipment, mechanism, or impression designed or primarily used for making an access device or a counterfeit access device."   18 U.S.C. § 1029(e)(6).   "Access device" pertains to "any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)."   18 U.S.C. § 1029(e)(1); see also United States v. Handy, 592 Fed. Appx. 893, 909-10 (11th Cir. Jan. 30, 2015) (unpub. op.) (social security numbers qualify as "access devices" under § 1029(e)(1)). "Counterfeit access device" is "any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device."   18 U.S.C. § 1029(e)(2).   "Unauthorized access device" is "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud."   18 U.S.C. § 1029(e)(3);[13]  see also United States v. Elmardoudi, 611 F. Supp. 2d 879, 890 (N.D. Iowa 2008) (fraudulent social security cards and state identification documents qualify as unauthorized and/or counterfeit access devices).

As set forth at trial, Muho, upon being fired from FAM, retained unauthorized copies of information contained on FAM's computer servers (GTX 2C-1, 6B-C).   This information included, among other sensitive and proprietary data, the personal and financial identifying information of current and former FAM employees, interns, clients, and others (GTX 6B-C). Thereafter, Muho, without lawful authority, utilized device making equipment and the means of

---

[13]   "The term 'produce' includes design, alter, authenticate, duplicate, or assemble . . . [and] the term 'traffic' means transfer, or otherwise dispose of, to another, or obtain control of with intent to transfer or dispose of."   18 U.S.C. §§ 1029(e)(4)-(5).

identification of numerous real person victims to obtain and/or produce numerous counterfeit access devices and unauthorized access devices.   These counterfeit and/or unauthorized access devices included credit cards, casino cards, loans, debit cards, bank accounts, identification cards, driver's licenses, social security cards, and U.S. passport cards and copies.   The real person victims included the following: T.D.V., M.H.G., M.G., M.J.O., J.T.M., R.C., M.P.G., C.F., J.P., M.M., and A.F., among others (GTX 2B-1-4, 6B-C, 7B-1-3, 8B-I, 8M-3-12, 15C, 20, 21A, 22, 23A, 24A, 25A-C, 26A, 27A, 28A, 29, 31, 35, 37A-B, 39A-C).

Based on the various items discovered at Muho's Miami Condo, law enforcement also seized counterfeit and/or unauthorized access devices, which included fictitious driver's licenses, from various states, for victims R.C., M.P.G., T.D.V., and J.T.M. (GTX 8B).   Law enforcement also seized numerous bogus prescription pads, containing fictitious Drug Enforcement Administration ("DEA") and medical license numbers for the name "Gerard Morgan MD" (GTX 8L).   Additional investigation also revealed that Muho, during October 2015, submitted a fraudulent DEA Form 224 application in order to obtain a license to prescribe Schedule II drugs, in the name "Gerard Morgan," claiming to be a Cornell-educated doctor (GTX 51).

A review of Muho's T.D.V. gmail account revealed email exchanges involving the production of counterfeit and unauthorized access devices (GTX 22).   A review of Muho's seized computers also revealed the production of counterfeit and unauthorized access devices, including the use of device making equipment (GTX 3, 4, 6B-C).   For the Lenovo laptop computer (GTX 3), these counterfeit and unauthorized items included: U.S. passport cards (item #s 130232, 130237, 130244, 132460-461, 132469); U.S. passport copies (item #s 130352, 130385, 132494); state driver's licenses (item #s 130236, 130239, 130339-340, 130343, 130346-347, 130363-365, 132470, 132537, 132544-545); social security cards (item #s 130254, 130257, 130277, 130297,

130308, 130313, 130315, 130321, 132463, 132467); and W-2 statements (item #132521) (GTX 6B).   For the Apple laptop computer (GTX 4), these counterfeit and unauthorized items included: state driver's licenses (item #s 6163, 6960, 14787, 14796, 14827, 23682, 27802, 27861, 27978, 28003, 28702, 28864, 29149, 29195, 29317, 29321, 29413, 29475, 29494-495, 29630, 29659, 29676, 29743, 31135, 34575, 34577, 34609, 34611, 34700, 34892, 34976); social security cards (item #s 23686, 24019, 28873, 29208, 29342, 29472, 29682, 31598); U.S. passport cards (item #s 27115, 28374, 29358, 29616); W-2 statements (item #29200, 29211, 29819, 29826); and U.S. passport copies (item #s 29509, 29704, 29778, 29915, 30643, 30649) (GTX 6C).

Additionally, for purposes of Count 2, Muho created and submitted counterfeit IRS W-2 and 1099 forms to Space Coast for purposes of obtaining a car loan (GTX 18B, 19A).   For Count 17, Muho created and submitted counterfeit social security cards, in the names of "Kris Blair" and victim M.H.G., for purposes of obtaining a $15,000 bar study loan form Sallie Mae (GTX 37B). For Count 18, Muho created and submitted, in the name of victim, T.D.V., a counterfeit paystub, Ohio driver's license, and altered bank statement for Wells Fargo account xxx-7601, for purposes of obtaining a $35,000 loan from Upstart (GTX 29).   When fraudulently obtaining an Equifax account in the name of T.D.V., Muho also created and submitted a counterfeit social security card and fictitious Ohio driver's license (GTX 35).

Under U.S.S.G. § 2B1.1(b)(11), the Government's trial evidence overwhelmingly demonstrates that Muho: 1) possessed or used of device-making equipment; and 2) produced or trafficked in unauthorized or counterfeit access devices.   See U.S.S.G. § 2B1.1(b)(11)(A)-(B). The two-level adjustment applies and Muho's offense level should increase to 33.

### G.    $1 Million or More Derived From Financial Institution

Under § 2B1.1(b)(16)(A), the PSI correctly assigns Muho a two-level adjustment because

he derived more than $1 million in gross receipts from a financial institution (PSI ¶ 93).    Financial institutions are "any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, . . . brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; . . . and any similar entity, whether or not insured by the federal government."    U.S.S.G. § 2B1.1 cmt. n.1.    "Gross receipts" pertains to "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense."    U.S.S.G. § 2B1.1 cmt. n.11(B).

"[A] financial institution is a source of the gross receipts when it exercises dominion and control over the funds and has unrestrained discretion to alienate the funds."    United States v. Stinson, 734 F.3d 180, 186 (3d Cir. 2013).    "By stealing or fraudulently borrowing from a financial institution, the criminal is putting that institution's financial safety and soundness at risk. The [Section 2B1.1(b)(16)(A)] sentencing enhancement thereby penalizes the criminal for this reckless behavior."    United States v. Huggins, 844 F.3d 118, 123 (2d Cir. 2016) (distinguishing Stinson and noting need to also "focus on the loss or liability incurred by the financial institution").

Muho falsely and fraudulently induced HSBC-Monaco to wire him approximately $2,067,377.24 from Soundview Elite's account (GTX 2C-7, 9A-H, 43).    Thereafter, Muho quickly transferred these funds to various other bank accounts for his own use and benefit (GTX 43).    As a foreign bank, HSBC-Monaco is a financial institution (GTX 9A-H).    See U.S.S.G. § 2B1.1 cmt. n.1.    HSBC-Monaco exercised dominion and control of Soundview Elite funds and possessed discretion to release them.    HSBC-Monaco's decision to send $2 million to Muho, based on his material misrepresentations, also clearly exposed them to potential loss and liability. See Stinson, 734 F.3d at 186; Huggins, 844 F.3d at 123

The two-level adjustment under § 2B1.1(b)(16)(A) applies and Muho's offense level should increase to 35.   Because Muho was also convicted of violating 18 U.S.C. § 1957, his offense level further increases to 36.   <u>See</u> U.S.S.G. § 2S1.1(b)(2)(A) (PSI ¶ 94).

**H.   Use of Special Skill/Abuse of Trust**

Under Section § 3B1.3, a two-level enhancement is warranted "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense . . . ."   U.S.S.G. § 3B1.3.   The PSI correctly assigns Muho this two-level adjustment because he "abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense" (PSI ¶ 96). To the extent that the PSI fails to alternatively hold Muho accountable for use of a special skill under § 3B1.3, the Government objects.

*1.   Use of Special Skill*

"Special skill" pertains "to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing."   U.S.S.G. § 3B1.3 n.4.   A "defendant's legal training clearly constitutes a special skill, as lawyering is specifically listed as an example of a special skill in the text of the Guideline."   <u>United States v. Maurello</u>, 76 F.3d 1304, 1314 (3d Cir. 1996) (upholding special skill enhancement for previously disbarred attorney in mail fraud case).

During 2012, Muho received a J.D. degree from UC Berkley Law School (GTX 36). Starting in and around June 2012, Muho was employed in New York, NY, with investment firm Fletcher Asset Management ("FAM").   Muho was selected to participate on the Boards of Directors for various international investment funds and provided signature authority on various related bank accounts.   In his own trial testimony, Muho also bragged about his prior educational and investment experience before joining FAM.

Upon his termination from FAM, and in order to execute and conceal his fraud schemes, Muho utilized, for purposes of § 3B1.3, special legal and investment skills.   During April 2013, Muho created the sham Delaware company "Leveraged Hawk Inc." (GTX 10B-1).   Muho also created other shell companies and entities: GM Capital, Blue Land Trust 5303; Acacius S LLC; and Sera Group LLC, among others (GTX 9A-H, 10B-1-3, 15A-4, 43, 44).

Muho created and utilized a fictitious litigation and stock sale agreement claiming that he was entitled to $5 million from various Richcourt entities (GTX 2C-8).   Muho also submitted various false and fraudulent wire instructions to Wilmington Trust requesting that Wilmington Trust transfer approximately $5 million from various Richcourt accounts to his Citibank account xxx-5214.   Muho created, utilized, and filed a false and fraudulent "Certificate of Merger" with the State of Delaware claiming that a variety of foreign investment funds, including Soundview Elite, had agreed to merge into his sham company Leveraged Hawk (GTX 10B-1, 43).   He also filed similar false and fraudulent documentation and information with the SEC in order to present himself as a registered SEC investment advisor.   Muho could not have engaged in any of these activities without using special legal and investment skills.

Thereafter, Muho, utilizing his purported SEC credentials, materially misrepresented to HSBC-Monaco, via email statements and purported legal documents and agreements, that he possessed legal authority to execute financial transactions on behalf of Soundview Elite (GTX 2C-7, 9H, 43).   To further disguise and conceal his schemes, and create an aura of legitimacy to his criminal conduct, Muho used his legal skills to file a series of civil lawsuits and appeals against various of his own victims in state and federal jurisdictions (GSX 1A-U).   These jurisdictions included:

- <u>Northern District of California</u> – case numbers 13-3469 (filed 7/25/13, dismissed

11/26/13) and 14-3219 (filed 7/16/14, dismissed 3/20/17) (GSX 1A-B)

- U.S. Court of Appeals for the Ninth Circuit - case numbers 15-15116 (filed 1/22/15, dismissed 3/20/15) and 15-16490 (filed 7/28/15, dismissed 3/16/17) (GSX 1C-D)

- State of California Superior Court (Alameda) - case number RG-14-729263 (filed 6/6/14, removed to federal court 7/17/14) (GSX 1E)

- State of Delaware Superior Court (New Castle) - case number N14C-08-170 (filed 8/22/14, dismissed 3/28/16) (GSX 1F)

- State of Delaware Court of Chancery - case number CA9499 (filed 4/27/15, dismissed 5/18/15) (GSX 1G)

- State of Delaware Supreme Court - case number 3862015 (filed 7/22/15, dismissed 3/28/16) (GSX 1H)

- U.S. Court of Appeals for the Second Circuit - case numbers 14-3486 (filed 9/19/14, dismissed 1/16/15), 14-3998 (filed 10/22/14, dismissed 2/10/15), and 14-4675 (filed 12/19/14, dismissed 7/6/15) (GSX 1I-K))

- State of New York Supreme Court (Queens) – case number 0704413-2014 (filed 1/12/17, dismissed 5/31/17) (GSX 1L)

- Southern District of Florida –case numbers 14-20568-CV-MOORE (filed 2/14/14, dismissed 8/8/14), 15-21396-CV-WILLIAMS (filed 4/13/15, dismissed 3/28/16), 15-23658-CV-HUCK (filed 10/1/15, dismissed & remanded to state court 10/28/15), 15-24622-CV-COOKE (filed & dismissed 12/17/15), and 15-23884-CV-LENARD (filed 10/16/15, dismissed 2/28/17) (GSX 1M-Q)

- U.S. Court of Appeals for Eleventh Circuit – case numbers 16-10377 (filed 1/29/16, dismissed 8/10/16) and 16-17190 (filed 11/21/16, dismissed 1/31/17) (GSX 1R-S)

- State of Florida Third District Court of Appeals (Miami) – case number 3D16-574 (filed 3/14/16, dismissed 4/4/16) (GSX 1T)

- State of Florida Supreme Court – case number SC16-356 (filed 2/26/16, transferred back to 3rd District Court of Appeals) (GSX 1U)

The two-level adjustment for Muho's use of a special skill that "significantly facilitated the commission or concealment of the offense" applies.   U.S.S.G. § 3B1.3.   Should the Court

decline to apply the enhancement for abuse of public/private trust, Muho should still receive the two-level enhancement under § 3B1.3.

>2.  *Abuse of Private Trust*

The PSI correctly assigns Muho a two-level adjustment for abusing a position of public or private trust "in a manner that significantly facilitated the commission or concealment of the offense" (PSI ¶ 96).   U.S.S.G. § 3B1.3.   "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).   Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."   U.S.S.G. § 3B1.3 n.1 (noting that enhancement applies as to "embezzlement of a client's funds by an attorney serving as a guardian").   Additionally, the enhancement "shall apply" where "[a] defendant who exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification."   U.S.S.G. § 3B1.3 n.2(B).

Section 3B1.3 applies "in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not."   U.S.S.G. § 3B1.3 n.3; see also United States v. Nguyen, 386 Fed. Appx. 675, 667 (9th Cir. 2010) (unpub. op.) (applying enhancement where defendant "held himself out as a mutual fund manager; that position is one typically characterized by professional discretion"). "Whether an individual is actually a stock broker, or is just pretending to be one, is the same for applying the abuse-of-trust enhancement. . . .   In either case, the defendant actually enters into a relationship of trust with the victim, who in turn grants the defendant discretion to act over his or her affairs."   Ghertler, 605 F.3d at 1265.

"Within the fraud context, we have explained that § 3B1.3 applies where the defendant is in a fiduciary, or other personal trust, relationship to the victim of the fraud, and the defendant takes advantage of the relationship to perpetrate or conceal the offense."   United States v. Szekely, 632 Fed. Appx. 546, 548 (11th Cir. Nov. 24, 2015) (unpub. op.) (citing Ghertler, 605 F.3d at 1264).   Federal fraud statutes also clearly contemplate the possibility of an offense possessing more than a single victim.   See United States v. Linville, 228 F.3d 1330, 1331-32 (11th Cir. 2000) ("bank fraud statute, then, contemplates a larger class of victims than the Medicare fraud statute.   It follows that more than one person could, depending on the case's facts, be the victim who reposes trust in the defendant").

"Since the 'primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong,' only such a defendant whose position enables or significantly facilitates the offense is eligible for this enhancement."   United States v. Garrison, 133 F.3d 831, 838 (11th Cir. 1998) (quoting United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996)).   "In analyzing whether section 3B1.3 applies in a fiduciary or personal trust situation, sentencing and reviewing courts must 'distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction.'"   Id.

Muho violated a position of private trust in two (2) ways.   First, as established at trial, Muho was entrusted with, and maintained, generous amounts of professional discretion and enjoyed minimal supervision at FAM.   See U.S.S.G. § 3B1.3 n.1.   Muho was provided access to all information on FAM's computer servers, participated on the Boards of Directors for various funds, and enjoyed signature authority on various related bank accounts.   Upon being fired from

FAM, Muho retained unauthorized copies of all data and information on FAM's computer servers (GTX 2C-1, 6B-C), and utilized this information without lawful authority, to obtain, access, possesses, and utilize numerous means of identification and commit the charged crimes.   Thus, Muho violated the private trust of his former employer and other FAM-related victims, including A.F. (GTX 2B-1-4, 6B-C, 7B-1-3, 8B-I, 8M-3-12, 21A, 22, 23A, 24A, 25A-C, 26A, 27A, 28A, 29, 31, 35, 37A-B, 39A-C).   See Garrison, 133 F.3d at 838 ("paradigmatic case is one in which 'the defendant steals from his employer, using his position in the company to facilitate the offense'").

Second, Muho violated the private trust of victim HSBC-Monaco.   Muho provided HSBC-Monaco with a serious false and fraudulent documents and held himself out as Soundview Elite's registered SEC investment advisor, with "legal title in all pertinent jurisdictions," and "sole title to the entities who currently have accounts with [the HSBC-Monaco] branch" (GTX 2C-7, 9H, 43).   See Nguyen, 386 Fed. Appx at 667.   Clearly, the private trust relationship between Muho and HSBC-Monaco was based on HSBC-Monaco's belief in Muho's "position in the transaction," not his personality or their own credulity.   Garrison, 133 F.3d at 838; see also Ghertler, 605 F.3d at 1265.   Based on their private trust in Muho's material misrepresentations, HSBC-Monaco wired him over $2 million in Soundview Elite's money (GTX 2C-7, 9H, 43).

The two-level adjustment under § 3B1.3 applies to Muho under the abuse of private trust prong.   His offense level should increase to 38.

I.     **Obstruction of Justice**

The PSI correctly assigns Muho another two-level adjustment for obstruction of justice (PSI ¶ 97).   See U.S.S.G. § 3C1.1.   This enhancement is warranted when a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with

respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."   U.S.S.G. § 3C1.1.

"Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."   U.S.S.G. § 3C1.1 cmt. n.1.   Covered conduct also includes "providing materially false information to a judge or magistrate judge."   Id. at n.4(F).   "'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."   Id. at n.6.

"'Perjury under oath on material matters, not due to confusion or mistake, justifies' an enhancement for obstruction of justice."   United States v. Williams, 627 F.3d 839, 845 (11th Cir. 2010) (quoting United States v. Geffrard, 87 F.3d 448, 453 (11th Cir. 1996)); see also United States v. Uscinski, 369 F.3d 1243, 1247 (11th Cir. 2004) (applying enhancement where defendant "did not simply deny his guilt, but instead concocted a false, exculpatory story that misled the government").   "A defendant who testifies at a suppression hearing may be subject to an obstruction of justice enhancement if he or she gives false testimony which is material to the decision whether the contested evidence should be suppressed."   United States v. Reddrick, 90 F.3d 1276, 1283 (7th Cir. 1996).

In determining whether a defendant has committed perjury, courts must find that a defendant's testimony was: 1) under oath or affirmation; 2) false; 3) material; and 4) willfully intended and not the result of confusion, mistake, or poor memory.   See United States v. Singh, 291 F.3d 756, 763 n.4 (11th Cir. 2002).   District courts remain in the best position "to assess a

defendant's demeanor, apparent sincerity, intonation, expression, gesticulations, and a wide range of other considerations that are pertinent in determining whether he has perjured himself." United States v. Williams, 340 F.3d 1231, 1240 (11th Cir. 2003). For purposes of § 3C1.1, Muho obstructed justice through materially false testimony at his suppression hearing and trial.

On January 31, 2017, Muho filed a pre-trial suppression motion as to evidence obtained from his Miami Condo (DE 92, 96). On February 6, 2017, the Court conducted a hearing and Muho provided sworn, materially false testimony (DE 226; GSX 15). Among other materially false statements, Muho claimed that: 1) he lived and paid rent at the Miami Condo pursuant to a yearly agreement with his own company GM Capital (DE 226 at 63); 2) during February 2016, he was "still a tenant of the property in question" (id.); 3) he did not have a loan on the property from CEM (id. at 65); 4) CEM never initiated foreclose proceedings against the Miami Condo due to Muho's failure to make loan payments (id. at 66-67); 5) he never received notice as to the final judgment of foreclosure (id. at 67-68); 6) CEM threatened his life and twice broke into the Miami Condo (id. at 72); 7) "I was in fear for my life" (id. at 73); 8) "there was never a foreclosure sale of [the Miami Condo] (id.); 9) he was never aware that the new owners obtained a writ of possession for the Miami Condo (id. at 75-76); 10) he was never served with an eviction notice (id. at 77); 11) he had lease agreement with the new owners (id. at 77-78); 12) he never abandoned the Miami Condo (id. at 84); 13) "I've never been served, never been evicted" (id. at 89); and 14) "my lease and my rights to live there were never terminated" (id. at 96). Muho committed perjury at the suppression hearing and his testimony was under oath, false, material, and willfully intended to mislead the Court.

As set forth in the PSI, Muho also repeatedly perjured himself at trial (PSI ¶¶82-87),. Muho's trial testimony, which occurred over a three-day period, was willful, intentionally false,

material, and provided under oath (id.).   It was squarely rejected by the jury and wholly at odds with the evidence and testimony provided during the Government's case-in-chief (DE 279). "[The defendant's] incredible testimony, in the light of all the credible evidence to the contrary, leaves us 'with the definite and firm conviction' that the sentencing court should have enhanced [defendant's] sentence."   Williams, 627 F.3d at 845 (quoting United States v. Poirier, 321 F.3d 1024, 1036 (11th Cir. 2003)); see also United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) ("we have said that, when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true").

Last, as demonstrated by the trial testimony of his own witness, FBI SA Maurice Hattier, Muho materially concealed his fraud conduct when meeting with law enforcement during 2013. Muho intent in meeting with law enforcement during 2013, after he had been fired from FAM and fraudulently obtained the $2 million from Soundview Elite, was not to serve as the noble whistleblower.   Muho did so in order to disguise and conceal his schemes, garner ammunition to threaten and blackmail FAM and its employees, and create an aura of legitimacy to his criminal conduct.   Section 3C1.1 applies to Muho's 2013 interactions with law enforcement and his suppression and trial testimony.   His final offense level should increase to 40.

## III.   **RESTITUTION**

The core federal restitution statutes are the Victim and Witness Protection Act of 1982 ("VWPA"), codified at 18 U.S.C. §§ 3663-3664, and the Mandatory Victim Restitution Act of 1996 ("MVRA"), codified at 18 U.S.C. § 3663A.   The VWPA authorizes restitution for a broad array of offenses, including Muho's crimes.   The MVRA mandates restitution for Muho's crimes.[14]   See 18 U.S.C. § 3663A(a)(1)-(2) and (c)(1)(A)(ii).

---

[14]   Aside from this and a difference regarding a defendant's economic status, "the two

"The amount of restitution is not necessarily identical to the amount of loss calculated under the Guidelines."   United States v. Singletary, 649 F.3d 1212, 1220 (11th Cir. 2011) (noting that advisory guidelines use greater of actual or intended loss).   Per the MVRA, victims are those "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the court of the scheme, conspiracy, or pattern."   18 U.S.C. § 3663A(a)(2); see also United States v. Edwards, 728 F.3d 1286, 1295 (11th Cir. 2013) ("lack of a conviction does not automatically prevent the district court from finding an injury sufficient for restitution so long as the injury is related to an offense of which the defendant was convicted") United States v. Brown, 665 F.3d 1239, 1253 (11th Cir. 2011) (citing United States v. Dickerson, 370 F.3d 1330, 1338, 1341 (11th Cir. 2004) and noting that "restitution may be ordered to a victim not named in the indictment").   "Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim" in any federal or state civil proceeding.   18 U.S.C. § 3664(j)(2).

"Although a defendant's conduct need not be the sole cause of the loss, any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct."   United States v. Yeung, 672 F.3d 594, 600 (9th Cir. 2012) (internal quotations and citations omitted) (also noting that "[t]he causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable"); see also United States v. Robertson, 493 F.3d 1322, 1334 (11th Cir. 2007) (defendant's conduct must be but-for cause of

---

statutes are identical in all important respects, and courts interpreting the MVRA may look to and rely on cases interpreting the VWPA as precedent."   United States v. Gordon, 393 F.3d 1044, 1048 (9th Cir. 2004).

victim's harm); <u>United States v. Stein</u>, 846 F.3d 1135, 155 (11th Cir. 2017) ("We also consider reasonable foreseeability when assessing proximate cause for purposes of actual loss under the MVRA").

When ordering restitution amounts under the MVRA, a defendant's economic circumstances are irrelevant.   <u>See</u> 18 U.S.C.  §§  3663A(a)(1) and 3664(f)(1)(A). [15]   "The restitution award must be the full amount of the victim's loss that was actually and proximately caused by the defendant's conduct, regardless of the defendant's current or anticipated ability to pay."   <u>United States v. Collins</u>, 854 F.3d 1324, 1329 (11th Cir. 2017).   "The purpose of restitution 'is not to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.'"   <u>United States v. Cavallo</u>, 790 F.3d 1202, 1238 (11th Cir. 2015) (quoting <u>United States v. Huff</u>, 609 F.3d 1240, 1249 (11th Cir. 2010)). District courts "must make specific factual findings of whether the victim suffered a loss and the amount of those actual losses."   <u>Huff</u>, 609 F.3d at 1249; <u>see also</u> <u>United States v. Kuo</u>, 620 F.3d 1158, 1164 (9th Cir. 2010) ("[A]ctual loss for restitution purposes is determined by comparing what actually happened with what would have happened if the defendant had acted lawfully"); <u>United States v. Sterling</u>, 685 Fed. Appx. 880, 885 (11th Cir. April 18, 2017) (unpub. op.) ("government need not calculate the victim's actual lost value with laser-like precision, but may instead provide a reasonable estimate of that amount") (internal citations and quotations omitted).

"District courts possess a great deal of flexibility in applying the MVRA to unique factual circumstances and conducting the calculation required by § 3663A(b)(1)(B)."   <u>Yeung</u>, 672 F.3d at 606.   When awarding restitution amounts, courts have included prejudgment interest, due

---

[15]   Under the MVRA, a defendant's economic circumstances are only relevant in terms of ordering the manner in which restitution is to be made.   <u>See</u> 18 U.S.C. § 3664(f)(2).

interest, and other lender expenses associated with holding the real estate collateral prior to taking title.  Id. at 601 (citations and quotations omitted).  Additionally, under the MVRA, courts may include: "lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  "Generally, investigation costs - including attorneys' fees - incurred by private parties as a 'direct and foreseeable result' of the defendant's wrongful conduct 'may be recoverable.'"  United States v. Gordon, 393 F.3d 1044, 1057 (9th Cir. 2004) (internal quotations and citations omitted); see also United States v. Beaird, 145 Fed. Appx. 853, 854 (5th Cir. 2005) (unpub. op.) (in fraud case, upholding restitution award under § 3663A(b)(4) for "attorney's fees and other litigation expenses"); United States v. Dwyer, 275 Fed. Appx. 269, 272 (5th Cir. 2008) (unpub. op.) (same); United States v. Corey, 77 Fed. Appx. 7, 12 (1st Cir. 2003) (unpub. op.) (upholding restitution award under MVRA for attorney's fees that were "entirely different in kind from those incurred where a crime victim initiates a civil lawsuit on the basis of the underlying offense"); United States v. Fiorentino, 149 F. Supp. 3d 1352, 1364 (S.D. Fla. 2016) (citing United States v. Bahel, 662 F.3d 610, 647 (2d Cir. 2011) and noting that "[a]ttorneys' fees incurred by the victim are recoverable pursuant to [18 U.S.C. § 3663A(b)(4)]").

The Government has the burden of proving a victim's restitution amount(s) by a preponderance of the evidence.  See 18 U.S.C. § 3664(e); United States v. Baldwin, 774 F.3d 711, 728 (11th Cir. 2014).  District courts "in determining the appropriate amount of restitution, may consider hearsay evidence that bears 'minimal indicia of reliability' so long as the defendant is given an opportunity to refute that evidence."  United States v. Bourne, 130 F.3d 1444, 1447 (11th Cir. 1997) (quoting United States v. Hairston, 888 F.2d 1349, 1353 (11th Cir. 1989)).

Pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664, this Court should order **$1,733,198.46** in total restitution as follows:

- Soundview Elite Investors c/o Corinne Ball, as Chapter 11 Trustee of Soundview Elite Ltd. = **$1,491,132.93 total** (GTX 43)

- Wells Fargo Bank = $26,532.97 (GSX 5 at 18-19) + $319.07 (GTX 46) = **$26,852.04 total**

- PNC Bank = **$10,746.14 total** (GSX 6 at 14)

- Bank of America = **$565 total** (GTX 46)

- Sallie Mae Bank = **$15,000 total** (GTX 50)

- American Express = **$2,667.47 total** (GSX 9 at 17)

- Capital One Bank = **$4,950 total** (GSX 10 at 3-4)

- Barclays Bank = **$1,352.86 total** (GSX 12 at 15)

- Amscot Financial = **$1,552 total** (GTX 7B-1, 7B-4, 7B-5)

- SunTrust Bank = **$1,905.13 total** (GSX 13 at 14)

- T.D.V. = **$176,474.89** total (GSX 16A-B)[16]

## IV.   TOTAL SENTENCE & 18 U.S.C. § 3553 FACTORS

Consistent with the 18 U.S.C. § 3553 factors and advisory guidelines, a total sentence of at least 316 months' imprisonment is entirely proper in Muhos' case.   From April 2013, and continuing until his arrest in May 2016, Muho executed a series of outlandish fraud schemes which victimized numerous real persons and business entities.   See 18 U.S.C. § 3553(a)(1)-(2).

---

[16]   As set forth in GSX 16A-B, T.D.V.'s legal expenses and attorney's free occurred during in and around October 2015 through in and around December 2015, and clearly were incurred in relation to the earlier private investigation to identify and uncover the culprit of Muho's fraud and identity theft offenses.   Thus, they are recoverable under 18 U.S.C. § 3663A(b)(4).

Consistent with 18 U.S.C. § 3553(a)(2)(A)-(C), Muho's sentence will reflect the seriousness of his crimes, promote respect for the law, protect the public, and provide just punishment and deterrence.   See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment"); United States v. Kuhlman, 711 F.3d 1321, 1328 (11th Cir. 2013) (vacating white-collar defendant's sentence and noting that it "sends the opposite message - it encourages rather than discourages [fraudsters] because they might conclude that the only penalties they will face if they are caught are disgorgement and community service"); United States v. Peppel, 707 F.3d 627, 641 (6th Cir. 2013) (vacating white-collar defendant's sentence and rejecting notion "that individuals with certain professional qualifications . . . should be sentenced lightly on the asserted ground that they offer more to society than those who do not possess such knowledge and skill").

> [B]ank fraud . . . tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate decision.   It is precisely at this point - when the thief of above-average education and wit is deciding whether to do the deed - that reflection on probable prison time - general deterrence - can have an effect.

United States v. Edwards, 595 F.3d 1004, 1021 (9th Cir. 2010) (Bea, J., dissenting).

"'Restitution is desirable but so is the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail.'"   United States v. Treadwell, 593 F.3d 990, 1012 (9th Cir. 2010) (quoting United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006)).   Although the Muho may contend that a lengthy sentence of imprisonment outweighs the need to order full restitution, any such argument is meritless.   Treadwell, 593 F.3d

at 1012 ("According to [the defendant's] reasoning, the greater the amount of loss, the shorter the prison sentence should be, so that the defendant can begin repaying the victims sooner. This argument borders on frivolous").

The U.S. Court of Appeals for the Seventh Circuit has also urged sentencing judges:

> Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (internal citation omitted).

For Counts 1-19 and 38-40, Muho's total offense level should be 40. With a category I criminal history, Muho's total advisory guideline range should be 292-360 months' imprisonment. Pursuant to the statutory factors set forth in 18 U.S.C. § 3553, this Court should impose the following sentences: 1) for Counts 1-18, a sentence within the 292-360 month advisory guideline range for each count; 2) for Count 19, a sentence of 240 months' imprisonment; 3) for Counts 38-40, a sentence of 120 months' imprisonment for each count. Additionally, Muho's sentences for Counts 1-19 and 38-40 should all run concurrent with each other. For Counts 20-37, under § 1028A, the Court must impose at last one (1) consecutive 24-month sentence to Muho's total sentence for Counts 1-19 and 38-40.

Considering the 18 U.S.C. § 3553 factors, a total sentence of at least 316 months' imprisonment is entirely reasonable. The nature and circumstances of Muho's crimes, including the length, bread, and scope of his fraud conduct and his repeated false sworn testimony in various judicial hearings, warrant such a sentence. See 18 U.S.C. § 3553(a)(1). As to the kinds of

sentences available and the need to avoid unwarranted sentencing disparities, Muho has repeatedly denied his guilt.    Additionally, the Government's sentencing recommendation comports with the advisory guidelines and statutory maximum penalties for Muho's various crimes.    See 18 U.S.C. § 3553(a)(4)-(6).

A 316-month sentence will also reflect the seriousness of Muho's crimes, promote respect for the law, and provide just punishment and deterrence.    It will also send a clear message to educated, law school graduates that engage in egregious multi-year fraud schemes, obstruct justice, and abuse the criminal and civil legal process, that their conduct will be met with a just, meaningful sentence, not simply a stern warning or slap on the wrist.    See 18 U.S.C. §§ 3553(a)(2)(A)-(C).

## V.    CONCLUSION

WHEREFORE, the undersigned respectfully requests that this Court uphold the PSI adjustments set forth above and impose a total sentence, consistent with the 18 U.S.C. § 3553(a) factors and within the advisory guideline range, of at least 316 months' imprisonment.

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By:    *s/ Sean T. McLaughlin*
SEAN T. McLAUGHLIN
Assistant United States Attorney
Court ID No. A5501121
99 NE 4th Street, 8th Floor
Miami, FL 33132
Phone: (305) 961-9013

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on November 14, 2017, I electronically filed the foregoing document with the Clerk of the Court and counsel of record using CM/ECF.

<u>*s/ Sean T. McLaughlin*</u>
SEAN T. McLAUGHLIN
Assistant United States Attorney