UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,   CASE NO: 16-20390-CR-BLOOM

        Plaintiff,

vs.

GERTI MUHO,

        Defendant.

_____/

## ADDITIONAL OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AS REQUESTED BY DEFENDANT

Defendant, GERTI MUHO, requests that the Court consider the following additional objections to the presentence investigation report in the within action:

**PART A.  THE OFFENSE**

**Offense Level Computation**

**Base Offense Level**

**1.  Paragraph 101:**

Number of Victims Enhancement

Muho submits that the PSI Report incorrectly adds a two-level enhancement for having 10 or more victims in the case. Only victims suffering an actual loss or those whose information was used without their permission may be counted as victims.

Defendant caused actual loss of $1.7 million to Soundview Elite Ltd. (Defendant objects to this loss being part of the loss calculation because Defendant was not charged

in this case for this fraud and because this loss was not relevant to the conduct charged in the Indictment. But Defendant proceeds under the assumption that the Court will find this loss relevant for victim calculation purposes). In addition, Defendant caused actual loss of $15,000 to Sallie Mae. The remaining losses on the indictment are de-minimis comprised mainly of fees charged by the banks themselves for bounced checks then they are from Defendant causing the banks actual losses. That amounts to two victims. In addition, there are five individuals charged in the indictment whose information Defendant used without permission. Defendant argues that these victims should not added to the total number of victims because Defendant did not cause any of these individuals any direct losses. But even including these five individuals, the total number of victims is 7; three fewer victims than the number that would trigger this enhancement.

The Guidelines provide that if a combination of the victims and the loss amounts overstate the seriousness of the offense, then a downward departure may be necessary. The guidelines give as an example a fraud that affects many people each for a small amount with resulting high losses and high number of victims. In this case a similar situation occurs: one victim suffers the high loss, but many victims each without any additional actual loss is added to bring the total offense level to one that overestimates the seriousness of the crime. And by combining the Soundview Elite Ltd. transfer with the aggravated identity theft crimes that occurred two years later and had negligible actual losses appears aimed to achieve a higher overall guideline level. The Soundview

transfer is providing the loss amounts from one victim alone, while the aggravated identity theft charges are adding the numbers of victims to obtain two additional levels to the Soundview Loss without any losses of their own. In other words, if charged separately without the Soundview Loss, the aggravated identity theft crimes would be adding two additional levels for the victims' enhancement to a base level offense of 7-10, increasing it to 9-12, and resulting in little additional penalty. But combining them with the Soundview Elite Loss and now they are being used to add two levels to level 36, bringing it to level 38, increasing the penalty by 3-5 years alone. This is clear gaming of the guideline and should not be allowed.

Bankruptcy Fraud Enhancement

Muho submits that the PSI report incorrectly adds a two-level enhancement for Defendant having listed fraudulently obtained assets in his pro-se bankruptcy filing in this district. But by listing the assets in the bankruptcy, Defendant did not conceal or hide assets in a bankruptcy proceeding. Knowing concealment of assets in a bankruptcy violates "judicial process," *United States v. Lloyd*, 947 F.2d 339 (8th Cir. 1991)(concur *United States v. Bellew*, 35 F.3d 518 (11th Cir. 1994) (knowing concealment of assets during bankruptcy proceedings qualifies as a violation of a judicial order"). Thus, this enhancement does not conform with the language of the enhancement found in the Sentencing Guidelines and case law; if the Defendant had not listed the assets then Defendant would have knowingly concealed or hid assets in a bankruptcy case, and the

enhancement would then clearly apply.

The Government objected and claimed this enhancement should apply because Defendant made false and colorful statements in two bankruptcy proceedings. But none of the colorful statements were false, and none of them were materially false. In the SDNY bankruptcy, Defendant filed a pro se motion as a party in interest requesting the bankruptcy court end the bankruptcy, claiming Defendant wasn't notified of the bankruptcy and that the bankruptcy was filed without proper authority. The judge denied Defendant's request based on laches, stating Defendant was too late in his challenge to the authority of the filing of the bankruptcy in the case. None of the statements were found to be false. The motion was denied on laches and none of the statements were material to the bankruptcy case at all. And since Defendant was never notified of the bankruptcy, he did not violate a specific order of the bankruptcy court and did not hide assets in that bankruptcy.

In the SDFL bankruptcy, Defendant did not hide assets; and Defendant's colorful statement have not been shown to have been false; or can they be shown to be so, given Defendant has e-mail records documenting the break-ins, has jail recordings of statements of Roman Kravchenko attesting to the veracity of Defendant's beliefs in the statements, and Defendant even went to the Miami PD to report the break-ins, making it impossible to prove the Defendant's statements to have been knowingly untrue. But regardless, Defendant's colorful statements did not violate a prior specific bankruptcy order as the sentencing guidelines require and Defendant did not conceal or hide assets.

This enhancement simply does not apply.

Sophisticated Means Enhancement

Muho submits that the PSI Report incorrectly adds a two-level enhancement because Defendant transferred funds between corporations he created. But the enhancement applies only if Defendant's purpose in transferring assets between corporations was to hide assets. And there is no evidence that Defendant's purpose was to hide assets by transferring them between corporations. The evidence all points to the contrary; that Defendant's use of corporations was not to hide assets because the transfers and the source of the funds were all disclosed in various court filings by the Defendant. Every single corporation was tied directly to Defendant, Defendant had registered each corporation with his correct information and his Florida home address with the Secretary of State of Florida. Thus, it cannot be said that Defendant took any of the actions he took with the goal of hiding his activity or of masking the source of the funds.

The Government objects and claims that Defendant's repeated court filings constitute sophistication meriting the enhancement. But a court filing is not an act meant to hide or mask the source of the funding. A person files an action in court to get a judicial determination of an issue in dispute. One does not hide the issue but discloses it and seeks a third-party determination of the issues. It is not an act meant to hide assets or conceal their source. And each of Defendant's filings is a complaint or action

by the Defendant seeking to remedy what Defendant feels was a wrong, and against various parties. Some are wholly unrelated to the others. And none of the actions or filings seek to hide or disguise the source of the funds but to seek a third-party determination of an issue in dispute.

Derived Gross Receipts

Muho submits that the PSI Report incorrectly applies a two-level enhancement for deriving more that $1,000,000 in gross receipts from one or more financial institutions because of the offense.

But the $2 million came from Soundview Elite. Ltd., and Soundview Elite Ltd. was a private company formed in the Cayman Islands and it is not a financial institution; it is not a bank, it is not an investment company, not a mutual fund, not a public investment fund, or a broker dealer, or a subsidiary of one. It is a private investment vehicle that invests in other private investment vehicles. If the enhancement is added because money came from HSBC Private Bank (Monaco), it is misplaced. While HSBC Private Bank (Monaco) qualifies as a financial institution, the funds were not derived from that bank but from Soundview Elite Ltd.  The enhancement is meant to apply to fraud that affects financial institutions themselves and not merely their customers.

See Commentary to Amendment 646 "Reason for Amendment. This thirteen-part amendment makes several technical and conforming changes to various guideline

provisions. First the amendment conforms the language concerning offense that "affected a financial institution" in subsection (b)(2) of 2B4.1 (Bribery in Procurement of Bank Loan and Other Commercial Bribery) with subsection (b)(12) of 2B1.1 (Theft, Fraud etc.)" Thus, this Amendment did not increase the scope of this enhancement to apply to fraud affecting a financial institution's clients and not the financial institutions themselves. See further: "the amendment modifies the four-level increase and minimum offense level of level 24 for a defendant who personally derives more than $1 million in gross receipt from an offense that affect a financial institution, now, by this amendment, at subsection (b)(12)(A). The amendment retains the minimum offense level but reduces the four-level enhancement to two level because of the increased offense levels that will result from the loss table for the consolidated guideline. The two-level increase was retained because elimination of the enhancement entirely would not provide an appropriate punishment for those offenders involved with losses that are in the $1 million to $2.5 million range of loss. The enhancement also was modified to address issues about what it means to "affect" a financial institution and how to apply to the enhancement to a case in which there are more than one financial institutions involved. Accordingly, the revised provision focuses on whether the defendant derive s more than $1 million in gross receipts from one or more financial institutions because of the offense. Thus, this enhancement is directed at those who derive their gain and who affect financial institutions themselves--not their clients. If it were extended to apply to a financial institution's customers, the enhancement would be extended to

apply to all fraud cases because in every case where a Defendant derives $1 million or more that $1 million or more would have come at one point or another from one or more banks or financial institutions.

The Government claims that the enhancement should apply simply because HSBC Private Bank (Monaco) had a property interest in the funds. In support it cites a 3rd Circuit case about a United States bank having a property interest in its customer's deposits. But HSBC Private Bank (Monaco) is not a US bank and its rights over its customers' accounts differ from those of US banks; and the money was not insured, and the bank never suffered any loss whatsoever. And even if a property interest existed, the funds were simply not derived from HSBC Private Bank (Monaco) but from its customers; the fraud did not affect that financial institution, was not directed at the financial institution, and the funds were simply not derived from the financial institution. Applying the enhancement simply because the financial institution held a property interest in the funds would extend the enhancement to apply to every fraud case where the money is held at some point at one or more banks, which is in essentially every fraud case.

Device Making Enhancement

Muho submits that the PSI Report incorrectly applies a two-level enhancement based on section 2B1.1(b)(11) for the possession or use of a device making equipment and the production or trafficking of any unauthorized device or counterfeit access

device. Defendant was found guilty of aggravated identity theft. According to 2B1.6(a)(2) "if a sentence under the [aggravated identity theft guideline) is imposed in conjunction with a sentence for an underlying offense do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense." While chapter 2 enhancements still apply to production or trafficking of any access device or authentication feature, Defendant neither produced nor trafficked in access devices or authentication features. Application Note 10 states that for purposes of 2B1.1(b)(11) authentication feature has the meaning given that term in 18 U.S.C. 1028(d)(1) while counterfeit access device has the meaning given that term in 18 U S. C. 1029(e)(1). According to 18 U.S.C. 1028(d)(1) authentication feature means any hologram, watermark. certification symbol code, image, sequence of number or letter, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified. Here Defendant neither produced nor trafficked in authentication features. And according to 18 U.S.C, 1029(e)(1) access device means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other means of account access that can be used to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument). Defendant neither produced nor trafficked in

access devices.

**2. Paragraph 104:** Muho submits that the two-level increase for abuse of a position of public or private trust and used a special skill in a manner that significantly facilitated the commission or concealment of the offenses is not warranted.

The PSI report adds a two-level enhancement for Defendant having occupied a position of trust. The PSI Report adds this enhancement because when Defendant refused to return to Fletcher Asset Management Inc. data in Defendant's possession after Defendant was fired from his position with the company. Defendant violated a position of private trust. But for the enhancement to apply there must be lack of supervision. See *United States v. Vinalay*, 2017 U. S. App. Lexis 13510 summarizing Eleventh Circuit case law. and stating that our case law demonstrates that lack of supervision is a necessary, but not sufficient basis for imposing the position of trust enhancement (citing *United States v. Ollison*, 555 F.3d 152 (5th Cir. 2009)). See also *United States v. Morris*, 286 F.3d 1 291 (2002) (finding attorney did not occupy a position of trust in relation to his victims despite Morris's status as an attorney may have been used to develop the trust of his victims). Here the Defendant was portrayed by the Government as an intern, albeit one who was graduated from law school but was neither a licensed attorney nor did he carry himself as one. Defendant's supervisor, Alphonse Fletcher, Jr. had repeatedly instructed Defendant to label himself a banker and not an attorney in his position (e-mails of these instructions abound). The PSI

Report simply relies on Defendant having had access to the data Defendant failed to return after being fired from his position. But access to the data. especially access given in carrying out a task, does not equal authority or discretion; neither does it equal lack of supervision. A bank teller has access to the bank's cash, but that does not place the bank teller in a position of trust vis-a-vie the bank, or the bank's customers. The PSI Report relies solely on Defendant's access and not on Defendant's authority over the data. And Defendant was closely supervised. There is no evidence Defendant was not closely supervised. The only evidence regarding supervision at trial was that Defendant was acting erratically and missing days at work. suggests he was closely supervised. And Defendant like every intern was closely supervised and monitored. Defendant's presence at his job was monitored by the minute; his arrival and break times were all carefully monitored and recorded; evidence regarding Defendant's arrival and exit times at work abound in e-mails at Fletcher. All of Defendant's acts at work moreover required pre-approval by his supervisor (e-mail evidence of such supervision and approval requirement abounds in Defendant's Fletcher e-mails at work). Defendant spent countless minutes on the phone with his supervisor alone during the time he worked there. E-mail chains where Defendant was given approval for all his actions where his approval for actions were sought, issued and recorded. While Defendant had signatory authority, that authority was limited to $5,000 in cash and such authority could only be exercised without prior written approval from Defendant's supervisor. Because application of this enhancement is foreclosed by Defendant's close supervision

at Fletcher Asset Management I Inc. and the lack of evidence put forth by the Government to the contrary, there is no need to determine whether Defendant occupied a position of authority at his job. But in any case, Defendant's position as an intern makes clear that any access given to the Defendant was for learning and training and not for purposes of exercising discretionary authority as needed for the enhancement to apply.

The Government's alternative theory claims that Defendant was in a position of trust with HSBC Private Bank (Monaco) by claiming Defendant had authority over the account held at the bank. But having authority over an account held by a bank does not place one in a position of trust with the bank. And by turning over funds held in an account to a person claiming legal authority over the funds, the bank is not trusting that person with the funds but transferring possession of the funds to that person. And the foreign bank was never the victim of Defendant's actions and Defendant never occupied any position whatsoever vis a-vie the bank.

   **3. Paragraph 105:** Muho submits that he did not obstruct justice by giving false testimony in this case and the two-level increase is not warranted.

The PSI report adds a two-level increase for obstruction of justice by giving false testimony at trial. For this enhancement to apply Defendant must have "(1) willfully obstructed justice with respect to the prosecution of the instant offense of conviction," and (2) "the obstructive conduct related to the defendant's offense of conviction and any

relevant conduct." For the purposes of this enhancement, a defendant obstructs justice when he perjures himself. A witness perjures himself when he gives "false testimony concerning a material matter with the willful intent to provide false testimony, rather than because of a confusion, mistake, or faulty memory." When a defendant objects to a sentence enhancement that results from his trial testimony, the district court "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice." *United States v. Dunnigan,* 507 U.S. 87, 94 (1993). The PSI reports states that Defendant obstructed justice by testifying that:

Defendant believed that his written resignations from the Richcourt Funds had no legal effect and were ridiculous. But these statements are both opinion testimony, one being a legal conclusion, and neither is factual testimony. And the opinion is taken out of context. Defendant stated that his belief was that the Richcourt management companies could remove and replace Richcourt Fund directors at any time--testimony corroborated by Deborah Midanek, and that was the basis of Defendant's opinion. Defendant's beliefs and opinions on the matter also cannot be material to a determination of whether Defendant had authority to act on behalf of Soundview Elite Ltd. in August 2013 or not, and they are more likely to be the result of mistake or confusion than they are to be false testimony given by the Defendant with willful intent to provide false testimony on a material matter

Defendant formed Leveraged Hawk Inc. to be an investigative company to uncover theft by Alphonse Fletcher of $100 million from the Richcourt funds, and that

the documents were fully legal. But it has never been proved, nor can it be proven, that Defendant did not form Leveraged Hawk, Inc. to investigate and recover funds for the Richcourt funds. Defendant approached dozens of law firms to assist him in the task, and even filed a researched lawsuit on behalf of the Richcourt fund in the Northern District of California on behalf of the funds; a lawsuit that was dismissed because Defendant was not an attorney and not on any other matters (and Defendant even hired a law firm to pursue the lawsuit). A finding that Defendant had no authority to act for Soundview Elite Ltd. and that he deprived Soundview Elite Ltd. of property does not mean Defendant's intentions have been shown to have been false. And the Government has put forth no evidence that Defendant did not intend to pursue the recovery of the Richcourt funds--only that Defendant had been fired and lacked authority over the funds on the date of the transfer. And again, these statements are more akin to legal conclusions that result from confusion or mistake than they are false testimony given by the Defendant with the willful intent to provide false testimony on a material matter. And Defendant's belief and his underlying intentions have no bearing or materiality on whether Defendant had authority or not to act for Soundview Elite Ltd. in August 2013.

Defendant told HSBC Monaco that he wanted to pay taxes. But this statement, taken out of context as it is, is evidence that has no bearing on the materiality of whether Defendant had authority to act for Soundview Elite Ltd. or not. It simply has no bearing on whether Defendant had authority over the funds of Soundview

Elite Ltd. or not.

Defendant had legal authority to use another people's information that were involved with Richcourt. Defendant's legal opinion on the matter again is not factual testimony but an opinion Defendant held regarding his authority over the Richcourt Funds. Defendant testified that he did not believe T.D.V., M.H.G. were real individuals but fictitious entities formed by his supervisor for bad purposes. Defendant should have known that the individuals were actual persons, and Defendant should not have relied on a mere Google search to check on whether the individuals were real persons or not; but whether Defendant believed Defendant had legal authority over the information or not is a conclusion of law or opinion and not a material fact: Defendant did not testify that either T.D.V. or M.H.G. had given Defendant authority to use his information to open bank accounts or apply for loans; Defendant in fact tried to apologize to T.D.V. in person for having used his information in the manner Defendant did. If Defendant had testified that T.D.V. or M.H.G. had given him authority to use their information that would have been testimony given with the willful intent to provide false testimony, and not testimony resulting from a mistake or confusion as Defendant's opinion of law was.

Defendant created GM Capital Management Inc. and Acacius S LLC to serve as investment advisor and research company respectively for the Richcourt Funds. First the Government has put no evidence that Defendant did not intend for the companies to act as testified, and only that Defendant lacked authority over the

Richcourt Funds. Defendant testified that Defendant created the entities to act as investment adviser and as a research entity to recover funds for the Richcourt Funds and charge them a fee, or a cut of the recovery, in addition to a flat fee that Defendant planned to charge the Richcourt Funds regardless of results. This is common practice in the financial industry. And Defendant has mountains of e-mails testifying to the veracity of these statements. And Mrs. Midanek herself testified that Defendant disclosed to her and to Fletcher Asset Management Inc. his intention to manage the Richcourt Funds and to investigate wrong previously done to the Richcourt Funds in early May 2013, well before Defendant even tried to transfer the Richcourt Funds-- with Mrs. Midanek testifying only that Defendant lacked authority to do so. Lastly it is not relevant or material to whether Defendant had authority over the Richcourt Funds and Soundview Elite Ltd. whether Defendant formed GM Capital Management Inc. to serve as investment adviser to the Richcourt Funds or not; same for Acacius S LLC: it simply doesn't affect Defendant's authority over the Richcourt Funds if Defendant's intention in forming the entities were as testified or not.

Defendant had purchased the Miami condo for rental income not to launder money, and that he had purchased the Maserati for corporate use. But Defendant was convicted of section 1957 money laundering, not section 1956 money laundering, and the purpose of the purchase is not material to a section 1957 conviction. So, neither of these statements are material to that matter, and neither was necessary to be proven false.

Defendant provided his real SSN and accurate information for the condo and Space Coast loans. But Defendant meant the social security number he had used was his real Social Security administration issued SSN, which was never shown to not have been the case--only that the SSN used was not Defendant's personal issued SSN. Defendant provided this additional context to his testimony. Defendant even provided a business tax filing of Defendant's using the SSN in question--making the SSN number in question real in the sense that it was issued to Defendant by the SSA. And in light of this additional context, that Defendant provided with his testimony, any untruthfulness that may exist in the statement is more likely the result of confusion or mistake and not of Defendant's willful intent to provide false testimony on a material matter; Defendant added this additional information to his testimony, that what Defendant meant by his real SSN was that the Social Security administration had issued Defendant the SSN to use for business purposes. Similarly, Defendant's beliefs as to the accuracy of the information provided are conclusory opinions that are not material as to whether Defendant operated a scheme to defraud or not, and they are more likely the result of mistake or confusion than they are the result of Defendant willfully providing false testimony for obstructing justice.

Defendant used his own Social Security number in applying for the Sallie Mae bar loan. Similarly, to above the statement is taken out of context. Defendant gave additional testimony that the SSN number he used for the Sallie Mae loan was issued

to him by the SSA for business use, and that the SSA issued the SSN used to Defendant himself. Defendant provided this additional context to the jury at trial; considering this additional testimony the statement is not false, and it is not a willfulness to obstruct justice.

Defendant did not know T.D.V., M.H.G., J.P., and C.F. were real persons. Defendant testified that he believed T.D.V., M.H.G. and C.F. we're not individuals but business entities formed by Alphonse Fletcher. The Government provided no evidence that Defendant knew the individuals were real individuals. The individuals did not work at Fletcher-Richcourt at the time Defendant worked there and no one testified that they had told Defendant the individuals were real persons. The Government stated that of course Defendant knew the individuals were real because Defendant knew their social security numbers. While the jury found Defendant knew or should have known the Defendants were real individuals, the jury's verdict would have been the same whether Defendant knew or should have known. Defendant believed the persons were not real because Defendant found the persons information in agreements that gave Defendant reason to believe the individuals were business persons. In T.D.V's case, Defendant found T.D.V.'s information in a contract to purchase an apartment at the Dakota that was being sold repeatedly, leading Defendant to believe the sales were between business entities to obtain liquidity and financing. In addition, in the contract T.D.V. was portrayed as a school teacher, earnings tens of millions of dollars a year. While not impossible, it did give Defendant

reason to believe T.D.V. was not real. And further proof is that Defendant blocked T.D.V.'s credit profile to block credit transactions in his name. T.D.V. testified to that. And Defendant did a google search that led to no results, in a day and age when everyone has a Facebook profile, especially at that age. Sometimes you want something so bad that you take any piece of information and run with it. Defendant should have known T.D.V. was a real individual, but that does not mean Defendant knew. And there's no evidence that has been presented to show that Defendant had actual knowledge T.D.V. was an individual. Same for M.H.G. and C.F. Defendant never testified at trial that he did not know J.P. was an individual. Defendant knew J.P. was an individual because Defendant dealt with J.P. when he changed his name on his diploma. If Defendant ever placed J.P. in the same group as the others--although unlikely--it was the result of mistake or confusion. Certainly not with intent to provide false testimony.

Defendant moved to Miami to investigate real estate and not to flee from New York. Defendant's statement has never been shown to be untrue. Defendant plastered his name and his Miami address across hundreds of legal filings served to every individual in New York; thus, it cannot be said Defendant was fleeing to Miami. And it is not material as to whether Defendant had authority to access Soundview Elite's account at HSBC Monaco or not.

**PART D.  SENTENCING OPTIONS**

**Custody**

**Guideline Provisions:**

Muho agrees that a two-year consecutive sentence for each of counts 20 through 37 is applicable pursuant to 18 U.S.C. section 1028A and that the Court has the discretion to impose that mandatory term to run concurrently, in whole or in part, only with another term that is imposed at the same time for an additional aggravated identity theft violation.

>THOMAS W. RISAVY, ESQ.
>Attorney for defendant
>1999 SW 27 Avenue
>Miami, FL  33145
>305-854-3772
>(Fla. Bar #801410)
>
>BY: /s Thomas W. Risavy
>        THOMAS W. RISAVY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 5, 2018, I electronically filed the foregoing Additional Objections To Presentence Investigation Report As Requested By Defendant with the Clerk of Court using CM/ECF.

>BY: /s Thomas W. Risavy
>        THOMAS W. RISAVY