UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,           CASE NO:  16-20390-CR-BLOOM

        Plaintiff,

vs.

GERTI MUHO,

        Defendant.

_____/

**SECOND ADDITIONAL OBJECTIONS TO <u>PRESENTENCE INVESTIGATION REPORT</u> AS REQUESTED BY DEFENDANT**

Defendant, GERTI MUHO, requests that the Court consider the following additional objections to the presentence investigation report in the within action:

**PART A.  THE OFFENSE**

**<u>The Offense Conduct</u>**

**Paragraph 101:**

**<u>Loss Amount</u>**

In *Valdez v. United States*, 726 F. 3d 684 (5th Cir. 2013), the Court explained that "our case law requires the government to prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level." (citing Isiwele v. United States, 635 F.3d at 202).  In the health care fraud context (Valdez) the amount fraudulently billed to Medicare/Medicaid is prima facie evidence of the amount of loss the defendant intended to cause but the amount billed

does not constitute conclusive evidence of intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing. (See *United States v. Singh*, 390 F,3d 168, 193—94 (2d Cir. 2004)(remanding for re-sentencing to give the defendant an opportunity to show that the total amount he expected to receive was less than the amount usually billed to Medicare/Medicaid). In Valdez, defendant's argument was that for years he consistently billed a high amount, knowing that he would only be reimbursed for a fraction of what was billed and his office manager's statement that "Those are our rates which are usually based on three times on what Medicare covers. That is pretty much standard practice" made it a clear error to calculate the intended loss without considering that evidence to rebut the prima facie evidence of intended loss.

In this case there are 19 charged crimes, one uncharged crime, and one uncharged, un-indicted $5 million proposed transaction that never occurred, and the PSI uses an intended loss amount for all of them. My subjective intent was never to cause the intended losses found in the PSI report. Also, because the 20 charged crimes and the uncharged crimes are quite unrelated to each other, the evidence that rebuts the charged crimes fake checks and false loan applications is quite different from the evidence that rebuts the intended losses for the uncharged crimes. Below is evidence rebutting my intention for the 20 charged crimes and the uncharged crimes separately.

Intended Loss Amounts - Counts 1 and 2

Counts 1 and 2 are super-collaterized loan frauds meaning the value of the collateral exceeded the value of the loans for each crime. That I provided worthy collateral in each instance as security for each loan is itself evidence I did not intend to cause the loss for each loan. In this case my failure to perform under the loans allowed the lenders to seize collateral and use the value against the loan. At trial, Carlos Martinez testified that in the case of non-performance he was secured by the collateral for the loan. Alexis Reade testified the loans were secured by the collateral for the loan regardless of the original source of funds used to purchase the collateral. Carlos Martinez testified he had been fully repaid for the transaction, interest and all. Space Coast testified it was in possession of the collateral. Further evidence that I did not have the subjective intent to cause the intended loss amounts were the payments against the loans that I made and for the Space Coast loan I didn't even borrow the charged intended amount in the PSI report, even after being approved for it. And listing both lenders as creditors in my bankruptcy filing acknowledged each loan gave each lender rights against the estate, and further evidences that I did not subjectively intend to cause them the intended losses stated in the PSI.

Intended Loss Amounts - Counts 3 through 6

Counts 3-6 charged me for opening bank accounts with a false identification. The accounts had a net positive balance of $900.

Intended Loss Amounts - Counts 7 through 12 or so (false check deposits)

The PSI uses the fake check's face value for its intended loss amounts. But that amount incorrectly states my subjective intent to cause the losses. As testified by the bank witnesses, the banks make available between $100 and $200 for each check deposited; the rest is made available upon clearance of the check. Because these were new accounts additional restrictions would be placed on the checks requiring the funds to be further funded from the bank before the money would be made available. Because the accounts from which the checks were written out of were all closed, that money would never be funded. In addition to testimony by bank employees at trial, this clearing and funding policy is common practice across banks. As in Valdez, where the number of claims submitted was three times higher than expected, I also never expected the checks to be fully cleared let alone funded, and I never held the subjective intent of receiving the face value of the checks. The employees' testimony makes that clear. Using the intended loss amounts at best for each check, the intended losses amount to no more than $100-200 depending on the bank, TD Bank and Wells Fargo at $100 per check; PNC Bank and Bank of America at $200 per check. Even those figures are unrealistic because some of the checks were deposited after the accounts had been frozen, which meant no money would be made available by the bank.

Intended Loss Amounts - Counts 13-19 or so (loan application crimes)

These can be further divided into collateralized and non-collateralized loan

applications, and there is additional evidence that rebuts my subjective intent to cause the intended loss amounts of the PSI for the collateralized loan applications. I intended to pay back all non-collateralized loans: the Upstart loan, the Mayor's loan and the Sallie Mae loan. The fact that I was borrowing the money under another person's name did not mean I did not intend to repay the loan. I was using my real home address for the loans and my own identity to tie myself to the loans as much as possible. I had a lawsuit against Citibank that I believed would yield results and that would allow me to pay back each loan. The lawsuit had already yielded results it the past and I had good reason to expect results and funds that would have allowed me to pay back the loans.

After the $2 million transfer in August 2013, I spent some of the money paying back loans I had taken out, further showing I held the subjective intent to repay the loans. Lastly, I myself withdrew a Sallie Mae loan application showing clear subjective intent not to cause the intended loss in the PSI report.

My reason for applying for the collateralized loans--the two auto loans with PenFed Credit Union -was to establish an account with PenFed Credit Union for the cosigner after the collaterized car loan was approved. My intent was not to buy an actual car. To buy an actual car I would have needed a real driver license under the name of T.D.V. which I did not have and could not ever obtain to register the vehicle with the DMV. Because the loans were further collaterized and the hypothetical vehicles would be required to be insured there is no reason not to apply the value of the collateral against the value of the hypothetical secured loans, bringing the intended loss

for these loans to zero, or close to zero.

If the intended loss amount of the PSI is used then because these were inchoate crimes, then a three-level decrease is warranted under the guidelines for uncompleted crimes.

Intended Loss Amounts for the uncharged $2 million transfer

I was never charged with this loss, and this transfer is not related to or relevant to the charged counts--it was more than two years after this transfer, after I was left without money, and to continue certain legal efforts that I felt would yield fruition, that I committed the charged counts in this case. Had I not suffered what I believed were certain wrongs against me between the time of the transfer and the time of the charged counts, I would not have committed the charged counts at all. If the loss is determined to be related to or relevant, then I never held the subjective intent to cause any loss to Soundview Elite Ltd. by this transfer. The purpose or intent of this transfer was to assist Soundview Elite Ltd. to recover what I believed was $100 million stolen in large part from that entity by that entity's former management. I used the funds to attempt to hire and I hired law firms to pursue the claims I believed Soundview Elite Ltd. held against its former management for the harm it suffered. I have retainer agreements to confirm such intent. I also filed a lawsuit pro-se on behalf of Soundview Elite, Ltd. Attempting to recover that entity's money. So even if the entity suffered a loss because of this transfer, it was never my subjective intent to cause the entity a loss by the

transfer.

Intended Loss amounts for the uncharged, un-indicted. $5 million transaction

      The $5 million transfer was intended to create an entity headed by independent directors to assist the Soundview and Richcourt funds investigate and possibly recover monies I believed were stolen from them in the past—-one of the independent directors intended for the entity was my law school professor and another one was a former TPG managing director to whom I have e-mail records documenting my invitation to him to serve as an independent director. I have dozens of e-mails to several law firms documenting my intention to create this entity to investigate harm done to the Soundview and the Richcourt entities. I believed I started requesting assistance from Cravath Swaine and Moore in February 2013, then contacted another one of my law school professors to request his help in February 2013, then a series of them, and then another professor of mine who was a partner at Crowell and Mooring LLP. I continued discussion with this professor, and I have an e-mail in the flash drive held by my stand-by attorney who gave a copy to the Court and the prosecution as well that documents that I did not intend to cause loss by the above transfer to the Soundview or Richcourt entities. Even if it is found that the latter transfer of $2 million caused a loss to the entity that transfer happened many months after the entity with the independent directors and the independent law firm that I intended to form failed.

Intended Loss amount for T.D.V

There is a nearly $300,000 loss for victim T.D.V. in the PSI report. As T.D.V, testified at trial, no loan was ever taken in his name, and no money was ever taken in his name or that any money was taken from him by my actions. This loss figure comes from an invoice issued by a New York Law firm to T.D V.  But because this loss is the result of professional services provided to T D.V. in connection with T.D.V.'s testimony at trial, the Sentencing Guidelines exclude from loss "costs incurred by victims primarily to aid the government in the prosecution and criminal investigation of an offense."

Non-charged PNC Bank. Wells Fargo bank losses

My account at the time held sufficient funds to cover the checks so no losses intended. The reason the check bounced was because the accounts had been frozen—unbeknownst to me and without any legal process.  Additionally, at trial, the prosecution objected that these transactions as being not relevant, and the objections were sustained. Using these transactions is merely a try to adding losses for every bounced check in the past and creating new victims in the case.

Non-charged American Express Losses

This involved an American Express account I had opened that was closed by American Express. I had charged between $2,000 and $53,000 and made payment of $1,750.

That is where the check came from that I deposited into the PNC account. And no loss was intended, as shown by making payments on the account. I then opened a credit account at an electronic store where I was approved. After I was approved, I turned the loan down because the interest rate was exuberant, nearly 150% of the credit issued. This is proof that I intended to repay all non-collateralized loans because I cared about the rate of interest charged. Roman Kravchenko can testify to this loan and my turning it down because he was there and put the money down for the loan.

THOMAS W. RISAVY, ESQ.
Attorney for defendant
1999 SW 27 Avenue
Miami, FL 33145
305-854-3772
(Fla. Bar #801410)

BY: /s Thomas W. Risavy
    THOMAS W. RISAVY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 5, 2018, I electronically filed the foregoing Second Additional Objections To Presentence Investigation Report As Requested BY Defendant with the Clerk of Court using CM/ECF.

BY: /s Thomas W. Risavy
    THOMAS W. RISAVY